Scranton Axle & Spring Co., to use, *v.* Scranton Board of Trade, Appellant.

Argued April 22, 1929. Before Moschzisker, C. J., Frazer, Walling, Simpson, Kephart, Sadler and Schaffer, JJ.

*Walter L. Hill,* of *Knapp, O'Mally, Hill & Harris,* with him *Frank E. Donnelly,* for appellant.—A promise to pay from a special fund does not impose general personal liability: Alexander v. Righter, 240 Pa. 22, 25-6; Keller v. Cohen, 217 Pa. 522, 526-7; Mosser Co. v. B. & L. Co., 290 Pa. 67, 73.

That the fund was a trust is manifest; it was not property of the board of trade; it was a separate entity created by certain members only, for a specific purpose, "the upbuilding of the city's industrial interests"; it was exactly what this court has said is a trust: Vosburgh's Est., 279 Pa. 329; Coates's App., 2 Pa. 129.

The fact that the purpose of a trust is one of the purposes of a corporation not chartered for the business of executive trusts is the very thing that gives the corporation the right and power to become a trustee: Cresson's App., 30 Pa. 437; Taylor v. Hoag, 273 Pa. 194; Dulles's Est., 218 Pa. 162.

An agent who exceeds his authority is personally liable; but that is not the rule as to a trustee who deals in relation to trust property with another who has knowledge of the trust: Noble v. Kreuzkamp, 111 Pa. 68; Kroeger v. Pitcairn, 101 Pa. 311.

It is always the duty of one purchasing from a trustee to look at the nature and extent of the trust: Bayard

v. Bank, 52 Pa. 232; Metzger v. Lehigh Val. T. & S. Dep. Co., 220 Pa. 535; Culver v. Real Est. Co., 91 Pa. 367.

From the inception of the case defendant has insisted that the resolution did not contemplate a contract of purchase and sale but a gift of the fund to enable the axle company to obtain needed working capital: Miller v. Rodd, 285 Pa. 16; Miles's Est., 273 Pa. 124.

*William J. Fitzgerald*, with him *John P. Kelly*, for appellee.—A contract or promise to pay may be restricted to a particular fund, so as to make the raising or the sufficiency of the fund a condition precedent to the liability, and in such case the promise cannot be enforced until the fund is realized, unless the failure to realize or collect the fund from which payment is made is due to the neglect, or to the unreasonable refusal to act, of the promisor, or is otherwise attributable to him: Montgomery v. Church, 4 W. & S. 542.

OPINION BY MR. JUSTICE SIMPSON, May 13, 1929:

On the former appeal in this case (271 Pa. 6) we reversed a judgment for defendant, on questions of law raised in the affidavit of defense. Defendant now appeals from a final judgment, following the dismissal of its exceptions to the report of a referee selected by the parties. The material facts, all of which appellant admits are undisputed, are as follows:

Defendant is a corporation of this Commonwealth, having for its purpose the promotion of the trade, commerce and industry of the City of Scranton and the County of Lackawanna. Affiliated with it are the Scranton Industrial Development Company and the Scranton Board of Trade Industrial Promotion Fund. The first is a Delaware corporation, which, inter alia, has power to and does loan money, upon such terms as it approves, to industrial concerns recommended by defendant. The second connotes a voluntary group of gentlemen, who

have agreed to contribute such specified sums, during stated periods, as defendant shall require of them, to "be used exclusively for the upbuilding of the city's industrial interests." As stated in the agreement signed by these gentlemen, "it does not contemplate any direct return or profit to the subscribers thereto, but only the incidental advantage which will accrue to all citizens of Scranton through the material growth and prosperity of the whole city."

Plaintiff, a Pennsylvania corporation, long engaged in the manufacture of axles and springs in Scranton, was in business difficulties, which it believed could be tided over if it could obtain the sum of $50,000. It applied to defendant for aid, which caused an audit of plaintiff's books and accounts to be made, and then referred the request to the development company, which, in turn, appointed a committee to investigate plaintiff's business. Following the report of this committee, negotiations were entered into between plaintiff and the development company, resulting in a plan (set forth in the resolutions about to be quoted), by which, if approved by defendant, the development company was willing to advance the $50,000 needed by plaintiff. On January 16, 1915, this plan was fully explained to defendant's board of directors, and they adopted the following resolutions embodying it:

"MOVED That the Scranton Axle & Spring Company be requested to issue $10,000 Dollars of 7% Preferred Stock and that the Scranton Board of Trade Industrial Promotion Fund shall *buy* at par this $10,000 of Preferred Stock in equal annual installments of $2,500 for four successive years, and that this $10,000 worth of Preferred Stock shall be turned over to the Scranton Industrial Development Company in consideration of [it] purchasing $25,000 worth of the First Mortgage bonds of the Scranton Axle & Spring Company at par and $25,000 of Collateral Trust Bonds of the same Company also at par."

"MOVED That a copy of the above resolution be sent to the Scranton Axle & Spring Company and also to the Scranton Industrial Development Company."

The $10,000 to be paid for the 7% preferred stock, referred to in these resolutions, was needed to redeem $14,000 of treasury bonds pledged to a local bank as collateral security for a loan of $10,000, without which redemption plaintiff would not have sufficient bonds to deliver as required by the plan. As but $2,500 was presently payable thereunder, certain of those interested in the plaintiff company, now the use-plaintiffs herein, were willing to endorse plaintiff's notes for $7,500, drawn to the order of the bank, and deliver them to it in lieu of the $14,000 of bonds, and also to contribute, without recompense, sufficient of their own bonds to make up the total number to be delivered to the development company, if assured that the $10,000 would ultimately be paid, in relief of their liability on their endorsements.

To enable plaintiff to carry out the plan thus agreed upon, its board of directors met two days after the adoption of the above resolutions, and unanimously resolved "That in compliance with the resolutions of [defendant] herewith presented, the proper officers of this company be authorized to take the necessary steps to legally issue $10,000 worth of preferred stock at 7% payable semi-annually, and to secure any authorization from the stockholders that may be necessary to comply with the requirements in such a case." Eight days subsequently, at plaintiff's annual meeting, the required sanction was given by all the stockholders then present, the rest of them assenting in writing to such action shortly thereafter. Following this, the pledged bonds were redeemed by the giving of plaintiff's note, endorsed by use-plaintiffs, who also contributed a sufficient number of bonds to enable the plan to go into effect, and were then given an assignment of the claim in suit. Subsequently plaintiff's board of directors authorized its president and treasurer to issue and sell $10,000 of the company's 7%

preferred stock. On the same day defendant was notified that plaintiff "would sell and deliver, and was ready to sell and deliver [to defendant] the preferred stock [of plaintiff] mentioned in the resolutions of [January 16, 1915] on the terms and conditions therein set forth."

On March 18, 1915, plaintiff delivered to defendant's secretary the first installment of the 7% preferred stock, of the par value of $2,500, the latter accepted the stock and paid for it, and in turn delivered it to the Development Company; which also received from plaintiff the $50,000 of bonds provided for, and paid that sum to plaintiff. When the second payment of $2,500 fell due, defendant did not deny liability, but requested a year's delay, which was granted; but at the end of that period asserted that it would make no further payments. Because of this, use-plaintiffs were compelled to pay the $7,500 still owing to the bank, and this suit for that sum was then brought to their use. During all the time covered by these proceedings, the subscribers to the promotion fund were subject to assessments by defendant, in an amount exceeding plaintiff's claim, and, so far as appears, they were abundantly able to pay such assessments, if defendant had called upon them to do so, but no such call was made.

Under these facts, defendant asks us to reverse the court below on eight grounds, which may be reduced to the following: (1) Was there a contract between plaintiff and defendant regarding the $10,000 of preferred stock, or was the transaction merely a proposed gift of that sum to plaintiff, which, being executory, was unenforceable? (2) If there was a contract, was it enforceable against defendant individually, as attempted in this suit, or only against it as trustee of the promotion fund? (3) Was the 7% stock wrongfully issued by plaintiff so that defendant was not required to accept it? and (4) Have use-plaintiffs any higher right than the legal plaintiff would have had if the suit had not been to their use?

It is difficult to understand how plaintiff could be receiving a gift of $10,000 from defendant, when, as part of the same transaction, it was to deliver $25,000 of its first mortgage bonds, $25,000 of its collateral trust bonds, and $10,000 of its 7% preferred stock, and was to get $50,000 only. True, defendant and the subscribers to the promotion fund were not to get any monetary return for the $10,000 to be paid for the preferred stock; the charter of the former, and the agreement entered into by the subscribers to the latter, exclude the idea that they ever shall. Nevertheless, since, as the resolutions show, defendant agreed the promotion fund would "buy" the stock at par from plaintiff and give it to the development company, there could be no gift as between the legal plaintiff and defendant, since the former was to give and did give a valuable consideration for all it was to get.

Nor is there any difficulty arising out of the contention that the suit should have been brought, if at all, against defendant as trustee of the promotion fund, and not individually. Defendant agreed that the subscribers to the fund "shall buy at par this $10,000 of preferred stock." Defendant had the power to compel the subscribers to supply the money to make that purchase, but refused to do so. It, and it alone, could assess them for the purpose, and hence its refusal breached the "shall buy" appearing in the resolutions, upon the faith of which plaintiff delivered its bonds to the development company and agreed to deliver the stock to defendant. It is undoubtedly true that, ordinarily, where a plaintiff agrees to look to a particular fund for payment, his right will be limited to a recovery from that fund (Chambers v. Jayne, 4 Pa. 39); but where, as here, the fund cannot be raised save by action on the part of defendant, which, despite its agreement, refuses to exercise its power to that end, it will be held individually liable because of that refusal.

On the former appeal (271 Pa. 6, 9) we decided that the preferred stock was legally issued, and see no reason to change our views on the subject.

Nor are we concerned with the question as to whether or not use-plaintiffs have a higher right than the legal plaintiff would have had. We agree that ordinarily a use-plaintiff can recover only on the legal plaintiff's right (Blue Star Navigation Co. v. Emmons Coal Mining Corp., 276 Pa. 352; Automobile Securities Co. v. Wilson, 293 Pa. 143) ; but, under the facts here, defendant would have been liable if there had been no use-plaintiffs, and hence this contention becomes unimportant.

The judgment of the court below is affirmed.