Argued January 17; reversed November 2, 1942; argued on
rehearing March 9; original opinion amplified June 15, 1943

# PUBLIC MARKET CO. OF PORTLAND v. CITY OF PORTLAND ET AL.

(130 P. (2d) 624, 138 P. (2d) 916)

Before KELLY, Chief Justice, and BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*C. A. Hart* and *Prescott W. Cookingham,* both of Portland (Hart, Spencer, McCulloch & Rockwood, Cookingham & Hanley, Harry Lehrer, and H. M. Tomlinson, all of Portland, on the brief) for plaintiff.

*George R. Wilbur, Robert C. Goodale,* and *Edgar Freed,* all of Portland, for defendants.
*L. E. Latourette, Robert A. Imlay* and *Wallace McCamant,* all of Portland (McCamant, King & Wood, of Portland, on the brief) for respondents.

LUSK, J.

This is a suit in equity instituted by Public Market Company of Portland, a corporation, for an accounting, and to obtain a decree specifically enforcing a contract by which the plaintiff undertook to .construct a market building on land owned by it to be owned and operated by the defendant City of Portland as a public utility. In addition to the City, Reconstruction Finance Corporation, hereinafter referred to as RFC, the owner of an issue of bonds secured by a mortgage on the premises in question, and The First National Bank of Portland (Oregon), trustee under the mortgage, are defendants.

The case was here before on demurrer to the complaint. We then held, reversing the decree of the circuit court which had dismissed the suit with prejudice, that the contract sued upon imposed a general obligation on the City to pay the purchase price therein named; that the contract was in some particulars ambiguous; and that, whether it was a general obligation contract or an agreement to pay the purchase price out

of a special fund, the complaint stated a good cause of suit for specific performance and an accounting. We accordingly remanded the cause for a trial upon the merits, the opinion concluding:

> "It must also be be borne in mind that the allegations of the complaint for the purposes of this demurrer are admitted to be true and, under the record now before us, we are passing merely upon the sufficiency of the complaint. When the whole matter is presented after a trial upon the merits, this court reserves for determination what construction should be given to the contract and all questions involving the liability of the City." 160 Or. 155, 180, 83 P. (2d) 440.

Thereafter, the cause having been put at issue, a trial was had at which a large volume of testimony was introduced, most of which bears upon the question of the construction to be given to certain important provisions of the contract. The circuit court held that the Market Company had agreed by the terms of the contract to look for payment of the purchase price solely to a fund to be created by the City by a sale of public market utility certificates, and directed that a decree should be entered in favor of the City; but counsel for the Market Company then suggested to the court that even under that theory it was entitled to a remedy if it had performed its contract; and, after a hearing upon that question, the court ruled that the Market Company had not performed its contract because it had failed to tender to the City a "going public market utility" within the meaning of that phrase as used in the instrument. Accordingly, findings favorable to the City were entered and a decree of dismissal, from which both the plaintiff and the defendants RFC and the bank have appealed.

On this appeal it is contended by the Market Company, as well as by RFC and the bank, first, that the evidence received at the trial supports and compels adherence to, the construction heretofore placed upon the contract by this court as to the nature of the obligation assumed by the City; second, that, under a proper construction of the words "going public market utility", the Market Company has fully performed the contract on its part; and, third, that even though the City's obligation be construed as a limited one, to pay the purchase price out of a special fund to be created by the City by the issuance and sale of public market utility certificates, still, since the City wrongfully breached and repudiated the contract by refusing to endeavor to create the fund, the Market Company is entitled to a remedy, if not of specific performance, at least in damages resulting from the breach.

These contentions will be discussed in the order in which they have been stated. The evidence to which we shall refer bearing upon the construction of the contract was all received without objection; much of it, indeed, was introduced by the plaintiff; and, while some point is made here that the contract is not ambiguous and therefore its meaning must be ascertained from its words alone, we think that that question is concluded by our former opinion, and that the evidence to be discussed was properly received and must be given its due weight and effect in determining the intention of the parties.

A contention of the defendants RFC and the bank, additional to those advanced by the Market Company, will be reserved for later consideration and discussion in this opinion.

## 1. *Construction of the Contract.*

### (a) *Nature of the obligation.*

The contract was executed under date of October 28, 1931. The plaintiff is referred to therein as the Company and the defendant City of Portland as the City. The Company agreed "that within fifteen (15) days after the City shall have procured the approving opinion of legal counsel of the authority of the City to issue and sell the public market utility certificates authorized by Ordinance No. 61192, it will resume active construction of a public market building upon the real property in the City of Portland hereinafter more particularly described, according to plans and specifications hereto attached marked Exhibit 'A' and hereby made a part of this agreement, and that it will complete the construction of such building according to said plans and specifications on or before July 15, 1932." The Company further agreed to "acquire and install in said public market building within ten (10) days after said building is completed, the equipment, materials and supplies more particularly described in Exhibit 'B', which is hereto attached and hereby made a part of this agreement." The City agreed to pay the Company the actual cost price of this equipment—estimated at $46,418—plus 10 per cent of the actual cost price to cover the services of the Company in making such purchases. The Company agreed that upon completion of the building and the purchase and installation therein of the equipment, materials and supplies described in Exhibit "B", "it will convey to the City, by warranty deed (and by bill of sale with relation to movable fixtures and personal property) good and marketable title" to the land, "together with the building and improvements thereon and all equipment,

materials and supplies therein, and furnish an abstract of title to said property."

Paragraph 6 provides:

"Upon completion by the Company of its obligations under this agreement, and at the time of the tender by the Company to the City of proper conveyances of said property and assignments of its leases, contracts and insurance policies affecting said premises, the City shall accept said conveyances and said assignments and shall pay to the Company the sum of $1,244,790.66; and as of the date of said conveyances and assignments and of the making of said payment by the City to the Company, there shall be an accounting between the City and the Company, and the Company shall pay to the City all prepayments of rent and pro rata shares of premiums and deposits based upon the unexpired portion of existing leases and all prepayments of other moneys under existing contracts which shall represent unearned income of the Company and the City shall pay to the Company all prepaid expenses which the Company has at that time advanced under the terms of its existing contracts. In addition to the principal sum of $1,244,790.66 hereinabove mentioned, and at the time provided for the payment of said sum, the City shall reimburse the Company in the full amount of the cash advanced and/or liability incurred by the Company in the purchase of the equipment materials and supplies described in Exhibit 'B', and shall pay to the Company in addition thereto, ten per cent (10%) of the purchase price of said equipment, materials and supplies to cover the services of the Company in making said purchases. Such purchases of materials, equipment and supplies shall be subject to the approval of the Council in all respects, including the price paid therefor. All payments due from the City to the Company hereunder, if unpaid to the Company when due, shall thereafter bear interest at the rate of six per cent (6%) per annum, payable quarter-annually."

The City reserved the right during the life of the contract "to require any alterations, additions or changes to be made in the plans and/or specifications of the market building and in the equipment, materials and supplies to be furnished", and agreed to pay the Company "the cost plus fifteen per cent (15%) of all such alterations, additions or changes."

It is provided in Paragraph 8:

"From the date of the execution and delivery of this agreement until completion of its other obligations herein set forth, the Company agrees that it will perform leasing service for the procuring of tenants for said public market building, the identity of such tenants and the terms and conditions of their tenancy to be subject to the approval of the City, through its Council, and agrees that before the City acquires said public market building it shall be so occupied as to be a going public market utility."

For this leasing service the City agreed to pay the Company 10 per cent of the gross revenue derived from rental, with a different rate of payment, however, for space reserved by the City and for farmers' space.

The contract concludes:

"IN WITNESS WHEREOF, said PUBLIC MARKET COMPANY OF PORTLAND has caused these presents to be executed in its corporate name by its President or Vice-President, and Secretary or Assistant Secretary, thereunto duly authorized, and its corporate seal to be hereunto affixed, and the said CITY OF PORTLAND has caused these presents to be executed by its Mayor, attested by its Auditor, pursuant to authority duly given under the terms of Ordinance No. 61566 of the City of Portland, enacted on the 10th day of October, 1931, and effective on the 10th day of

October, 1931, and Resolution No. 20291, adopted October 28, 1931.''

As stated, when the case was here before, we held that the contract imposed a general obligation upon the City to pay the purchase price agreed upon, but, by the concluding sentences of the opinion previously quoted, we reserved the right to adopt a different construction if that should be deemed proper after a trial upon the merits. That is the law of the case in accordance with which the parties introduced parol evidence designed to show what was the intention of the parties with respect to the nature of the obligation assumed by the City. This was the meaning of our decision, understood not only by counsel for the City but also by counsel for the Market Company, who took the lead in making proof of extrinsic facts as supporting their interpretation.

In view of the evidence now before us, we are of the opinion that the construction then adopted can no longer be adhered to.

The record, indeed, shows that the Market Company at one time submitted a form of contract which, if executed, would have imposed a general obligation upon the City in plain and unambiguous language, but the proposal was rejected; and at no time thereafter during the course of the negotiations was there any discussion looking to that character of agreement. On the contrary, the parties were as one on the proposition that the Company was to look solely to the proceeds of the sale of public utility certificates as the source of payment. What they expected, or had a right to expect, if the certificates could not be sold, or if the City in bad faith should refuse to attempt to sell them, is another question.

The language of Section 6 of the contract, standing alone, it is true, calls for no construction or interpretation, but doubt is cast upon the meaning of the parties by the references in the instrument to the ordinances authorizing the public utility certificate issue and the execution of a contract with the plaintiff. The public utility certificate measure, it is agreed on all sides, was intended by the City as the source of funds with which to pay for the market. As we now know, it was the only source. The uncertainty of meaning was upon the question whether the Market Company, by accepting a contract containing these references, had not agreed to look for payment of the purchase price solely to the source from which the City expected to get the fund; it led two members of this court to dissent from the majority holding that the contract, considered by its four corners, was a general obligation agreement; and was the reason for the court reserving the right to adopt a different construction from the one announced, after a trial upon the merits.

■■ In view of this ambiguity, oral evidence to determine the intention of the parties was admissible; not evidence, of course, of their undisclosed thoughts or opinions, which obviously was incompetent, but of their negotiations and of the circumstances leading up to and attendant upon the execution of the contract. The purpose of receiving evidence of this character is "to determine the intention of the parties and the meaning of the terms they used; and when these are ascertained it must prevail over the dry words of the agreement." *Kauffman v. Raeder,* (CCA 8th) 108 Fed. 171, 54 L. R. A. 247. It is not received for the purpose "of changing the writing, but of furnishing light by which to ascertain its actual significance". *Walker v. Brown,* 165 U. S.

654, 41 L. Ed. 865, 17 S. Ct. 453. See, § 2-214, O. C. L. A.; *Salem King's Products Co. v. Ramp*, 100 Or. 329, 356, 196 P. 401.

■ In the examination of that question it is not to be forgotten that the contract was entered into in October 1931, when the City of Portland, along with the rest of the country, was in the throes of the great depression. The City's financial condition at that time was described in the testimony of the late Mayor Baker as "terrible". Elaborating, he said:

"We were faced with cutting the salaries of employees. That is pretty serious. There were demands for, as of course there always is, but demands for more than we could possibly furnish from any amount of revenue we might raise from taxation, and it would be just pure insanity to have advocated any moneys for any other purpose than absolutely operation of the City and its obligations. The Federal Government was not giving us any money at all; unemployment we had to finance out of our meagre income. We had to have a special committee of citizens raising the fund. We didn't have a Santa Claus at Washington pouring any money in during my administration."

This economic situation, in connection with other circumstances, should make one slow to adopt the view insisted upon by the Market Company, if the opposite view is fairly permissible. We would not state the Market Company's position more strongly than it has been stated by its very able counsel. They do not claim that anyone, at the time that the contract was entered into, supposed that the City would ever have to resort to the general fund or to taxation to meet its obligation; on the contrary, they state that everyone fully expected that the utility certificates would be readily salable

and would produce the needed money. They say, however, that they obtained an agreement which bound the City to pay the purchase price whether or not the certificates produced the fund. They argue that that form of agreement was the deliberate choice of the City itself. We think, and will endeavor to show, that that is exactly the meaning of the proposition which the Market Company submitted and which the City rejected.

Before the City had definitely determined upon the policy of a municipally operated public market the Market Company had planned and had done some preliminary work looking toward the construction of a market building on its Front Street property in the City of Portland to be operated by it as a private enterprise; but later the City, itself, having decided to go into the market business, the Market Company, under date of February 3, 1931, offered in writing to build a market building for the City in accordance with plans and specifications submitted and "to take in payment of the land, the completed building, and complete equipment, $1,750,000.00 of public utility certificates of the City of Portland bearing interest at the rate of six per cent (6%)".

On April 3, 1931, the City Council passed a motion favoring the plaintiff's property as the site for the proposed public market in preference to a number of other properties which had been offered. On August 5, 1931, the City Council passed Ordinance No. 61192 authorizing the issuance and sale of public market utility certificates in an amount not exceeding $2,500,000 "to provide funds for the purpose of purchasing and establishing a public market as a public utility". Such certificates, it was provided, should not be a general obligation of the City, but payment of principal and

interest thereof was to be made solely from the net revenues of the market.

The original plan of exchanging public utility certificates for the completed market building, as suggested in the Market Company's proposal of February 3, 1931, was abandoned, owing to the opinion of City Attorney Grant that, under the terms of Ordinance No. 61192, the issue would have to be sold at public auction, and perhaps for additional reasons; and, under date of September 23, 1931, the Market Company submitted to the City's public market committee a proposed form of contract, which provided that, upon completion of the Market Company's obligations under the agreement and tender to the City of proper conveyances, the City "shall pay to the Company the sum of $1,750,000.00 *and in default of such payment the obligation to make the same shall become a general obligation of the City of Portland and shall be payable upon demand and shall bear interest at the rate of six per cent (6%) per annum payable semi-annually.*" (Italics supplied.)

This proposed form of contract contained no express reference to payment through the medium of the sale of public utility certificates, but accompanying it was an outline of three different plans for the retirement of the public utility certificates which the City was to issue.

Under date of October 5, 1931, Mr. Farrens, attorney for the Market Company, submitted to Commissioner Mann, at that time chairman of the public market committee, a second draft of contract designed to meet certain recommendations of the committee. In this draft the amount of the purchase price is left blank; otherwise the language regarding payment is unchanged.

Four days later, on October 9, 1931, the Council met to consider the market project. At this meeting the following occurred, as recorded in the official journal of the City:

"At this time His Honor, Mayor Baker, stated that he wished it clearly understood at this time, before the proceedings are taken up, that the proposed Public Market Building is not to be a general obligation of the City of Portland, but is to be financed by Utility Bonds, which bonds will not be sold until after the market building is completed.

"By unanimous consent the following persons were extended the privilege of the floor: Mr. Paul Farrens, representing the Public Market Company of Portland, Mr. Kenneth Harlan, representing the Central Municipal Market Company, and Mr. T. W. Baker, representing the Baker market project, all of whom accepted the terms for their respective companies as stated by Mayor Baker."

On the next day, October 10, the Council adopted Ordinance No. 61566, which designated the plaintiff's property for use as a public market and authorized the purchase of said real property and a building to be constructed thereon and equipment to be installed in said building "upon the terms and conditions required by said Ordinance No. 61192, passed August 5, 1931, and subject to the terms of the contract hereinafter referred to"; and further authorized the mayor and auditor to execute on behalf of the City a contract with the Market Company "for the purchase of the above described real property and a building to be erected thereon and equipped by said Public Market Company of Portland", etc. The city attorney was directed by the ordinance to prepare the form of said contract, which was to be approved as to form and contents by the Council by resolution prior to its execution by the

mayor and the auditor. The ordinance carried an emergency clause reciting, among other things, "the general unemployment situation which will be greatly relieved by the immediate construction of this building".

In accordance with the direction of Ordinance No. 61566, City Attorney Grant prepared a draft of contract which he submitted to Mr. Farrens some time between October 10 and October 22. The draft has two pages numbered 10, which contain alternative provisions for the sale of public utility certificates and payment of the purchase price therefrom. By the first of these alternative provisions it is stipulated that the principal sum of $1,244,790.66 and the cost of equipment, materials and supplies elsewhere provided for in the agreement "shall be paid to the Company solely from the proceeds of the sale of the public utility certificates authorized by Ordinance No. 61192." It is then provided in substance and effect that the City reserves the right to reject any and all bids on the first sale of said public utility certificates if a satisfactory price is not tendered, and in that event the City shall immediately re-advertise said public utility certificates "and in that event the Company shall bid for and purchase said public utility certificates, provided that in no event shall said public utility certificates be sold for less than ninety per cent (90%) of the par value thereof, and continue so to do until a satisfactory price is received therefor." By the second alternative provision it is also stipulated that the purchase price shall be paid solely from the proceeds of the sale of the public utility certificates, but the company is not required to bid in the certificates in case a satisfactory price is not received on the first sale, and the 90 per cent pro-

vision is omitted. The proposed agreement would, by its terms, have imposed on the City an obligation ''to create said fund by the sale of said public utility certificates so authorized by Ordinance No. 61192 and to exercise reasonable diligence in the creation of said fund'', would have allowed the City 90 days from the time the company tendered proper conveyances, etc., ''in which to create said fund by the sale of public utility certificates'', ''and in the event said fund is not created within that time, then subject to the prior conditions of this agreement any sums due the Company shall thereafter bear interest at the rate of six per cent (6%) per annum until paid through the creation of said fund'', etc.

After receiving Mr. Grant's draft, Mr. Farrens, under date of October 21, addressed to him a letter stating that it would be necessary to redraft Section 6 (the section containing the alternative provisions above referred to) ''to read as provided in the attached redraft''. The new Section 6 suggested by Mr. Farrens omitted all reference to public utility certificates and is in all material respects identical with that section of the contract as finally agreed upon. It does not, however, contain the language imposing a general obligation on the City in the event of a default which Mr. Farrens had inserted in the drafts theretofore prepared by him.

The portion of Mr. Farrens' letter which deals with the matter now under discussion reads as follows:

''When the proposal of Public Market Company of Portland was first made to the City it involved the acceptance by the Company of Public Utility Certificates in payment for the entire completed project. To this plan the City raised a number of objections, including the following:

"1st—That the issuance of the Utility Certificates at the time of commencement of the work would necessitate the payment by the City of interest thereon during the entire period of construction;

"2nd—That by reason of the discount which we anticipated in connection with our subsequent marketing of the Utility Certificates we had increased our price in a substantial amount over what we would be willing to take in cash;

"3rd—That this plan would involve the procuring of a completion bond at a very considerable cost;

"4th—That the City believed a better price could be realized from public advertisement and sale of the Certificates by the City than could be effected by a private sale of the Public Utility Certificate by the Market Company, thereby reducing the element of discount.

"Therefore the City proceeded upon the theory that the Public Market Company would be paid in cash and that the City would realize this cash by issuing, advertising and selling its own certificates.

"Banking arrangements which were effected by the Public Market Company for the necessary loan during the construction period were based upon following this plan and our bankers are unwilling to agree to any different plan or to any plan which would impair the obligation of the City to sell the certificates and make the cash payment provided for by the contract.

"I do not believe that there is any necessity or justification for providing a period of 90 days after the project is completed and ready to deliver to the City within which the City shall advertise for bids. The City can very readily keep track of the progress of the work and during the last 90 days prior to completion can make the necessary advertisements."

Mr. Farrens testified that he discussed with Mr. Grant these alternative provisions and explained to him the reasons for the company's objection to them as follows:

"This obligation on the part of the company to bid 90 simply meant this: That if we bid 90 and no other bidder thought the public utility certificates were worth that sum, then we were stuck with it and probably could not dispose of them without suffering a loss. On the other hand, if they were worth more than 90 somebody else would outbid us on that basis and we would not get them. So it was, as I expressed it to Mr. Grant and later at the meeting in the mayor's office I expressed it to them, it was a 'Heads I win, tails you lose' proposition. Now that is with respect to that first page, Mr. Hart. With respect to the second page, if we had consented to that, we had no real means of making the Council do these things; that is, issue these public utility certificates and sell them. And another reason for declining both of those pages 10 propositions was that you could not finance your venture on that sort of a basis. We could not find an underwriter who would agree to take that position of putting in a guaranteed bid of 90 for the reasons which I have just mentioned."

The meeting in the mayor's office referred to in the foregoing testimony was held on October 22, and was attended by Mayor Baker, Commissioners Mann, Barbur and Riley, City Attorney Grant and City Engineer Laurgaard. At that meeting Commissioners Barbur and Mann voiced objection to selling the certificates for less than 90, and Mr. Farrens stated his objections to the proposals of the City as he had previously stated them to Mr. Grant. The other commissioner, Mr. Clyde, was known to be opposed to a sale of the certificates at less than 90.

Mr. Farrens testified that, speaking for the Market Company, he frankly refused to entertain either of these two proposals, explained his reasons, and left the meeting "in the hands of the City authorities". Following this meeting Mr. Farrens and City Attorney Grant had further discussion with the result, as Farrens testified, "that in the final analysis Frank Grant said to me that the City was abandoning those two proposals and was going ahead with the contract in much the same way in that particular, at least, as it was first offered to them." Farrens further testified that, shortly after the initial proposals were made by his company and other companies to accept public utility certificates in payment, Mr. Grant called his attention to the fact "that the City would have to have legal title to the property in its own name before it could issue the trust deed, or whatever the encumbrancing conveyance was, and the public utility certificates and advertise them for sale. That was a bar from a legal standpoint to carrying out the first thought of accepting a certain quantity of public market certificates in payment of the purchase price of the market."

The upshot of the matter was that the parties, apparently on October 24, agreed upon the form of contract as it was actually executed. Its execution was authorized by resolution of the Council adopted October 28, 1931.

The contract, as executed, does not contain either of the alternative provisions of Mr. Grant's draft. It provides that upon the completion of the company's obligations and the proper tender of the premises "the City shall accept said conveyances and said assignments and shall pay to the company the sum of $1,244,790.66." It contains the following provision in Section 1, which

was not in the Grant draft: "The company agrees that within fifteen days after the City shall have procured the approving opinion of legal counsel of the authority of the City to issue and sell the public market utility certificates authorized by Ordinance No. 61192" it will resume active construction of the public market building, etc. It concludes by reciting that the contract has been executed by the mayor of the City and attested by its auditor "pursuant to authority duly given under the terms of Ordinance No. 61566 of the City of Portland, enacted on the 10th day of October, 1931, and effective on the 10th day of October, 1931, and Resolution No. 20291 adopted October 28, 1931." Ordinance No. 61566 is the ordinance which authorizes the execution of the contract as "conforming to the provisions of Ordinance No. 61192." The contract does not contain the provision of the Market Company's drafts submitted September 23, 1931, and October 5, 1931, that in default of payment by the City of the purchase price "the same shall become a general obligation of the City of Portland and shall be payable upon demand." The contract further provides that "all payments due from the City to the company hereunder, if unpaid to the company when due, shall thereafter bear interest at the rate of six per cent (6%) per annum, payable quarter-annually."

The minutes of the meeting of the Council of October 28 show that before the resolution approving the form and contents of the contract was adopted Commissioner Clyde "made a motion which received no second that a section be inserted in the agreement providing that the payment be made from the sale of utility certificates to be conditioned that the utility certificates be sold at a discount of not more than 10%", and that

Commissioners Barbur and Mann "stated that they would reserve the right to vote against an award of utility certificates which would entail more than 10% discount at the sale of the certificates."

Mr. Clyde was the only commissioner to vote against the motion for the adoption of the resolution.

The meeting at which the foregoing proceedings were had took place at 10 a. m. on October 28. At 2 p. m. of the same day the Council held an adjourned meeting and unanimously adopted a resolution directing the city auditor to prepare and transmit to Teal, Winfree, McCulloch & Shuler an abstract of proceedings up to date taken by the Council for the purpose of issuing public market utility certificates of the City of Portland with a view to securing a legal opinion as to the authority of the City to issue and sell such certificates under Ordinance No. 61192.

City Attorney Grant died before the trial and we are, therefore, without the benefit of his testimony.

The foregoing narrative is limited to facts which are of record and about which there is no dispute and to evidence introduced on behalf of the Market Company. We shall later refer to evidence introduced by the City, which has been sharply controverted.

It is conceded that in the beginning no one connected with the transaction entertained the idea of a general obligation contract. The original plan was to exchange public utility certificates for a market. This plan, as has been seen, had to be abandoned. Then came the Farrens drafts submitted September 23, 1931, and October 5, 1931, providing that in default of payment of the agreed purchase price the obligation to make the same should become a general obligation of the City of Portland. It is a reasonable inference that it was this pro-

posal which evoked Mayor Baker's emphatic and unequivocal statement at the Council meeting of October 9, 1931, "that the proposed public market building is not to be a general obligation of the City of Portland but is to be financed by utility bonds". That statement was made at a public meeting of the Council in reference to a matter of great public interest which the press was extensively reporting. Four of the five members of the Council and the city attorney were present. Representatives of the plaintiff and of competing projects were also present and took the floor and expressly "accepted the terms for their respective companies as stated by Mayor Baker". The three members of the Council present, in addition to the mayor, must, by their silence, be deemed to have given assent to his statement, and there is not the slightest suggestion in the evidence that any of them at any time either entertained or expressed a contrary view.

Mayor Baker's statement was intended, in our opinion, to inform the public, as well as those seeking to enter into a contract with the City, of the City's position, and the publicly expressed acceptance of that position by the representative of the plaintiff imposed upon it the clear duty, if afterwards it should desire an entirely different type of agreement, to make that desire known to the Council in language not capable of being misunderstood. That it did not do so is shown by the record; that it never thereafter intended to exact any such agreement appears from the plaintiff's own brief, as we shall presently point out.

On the very next day following this statement by Mayor Baker and the acquiescence therein by the Market Company's representative, the Council enacted Ordinance No. 61566, authorizing the purchase of plain-

tiff's property and a public market building to be constructed thereon. The title of that ordinance contains the recital that the purchase is to be made "upon the terms and conditions required by Ordinance No. 61192, passed August 5, 1931, *and upon such other terms and conditions* as shall hereafter be determined by the Council." The words which we have italicized were a subject of controversy in this court on the former appeal. It was contended on behalf of the City that the word "other" should be construed to mean other terms and conditions not in conflict with Ordinance No. 61192, and that, since the two ordinances are expressly referred to in the contract, and the purchase by the City of a public market "upon the terms and conditions required by Ordinance No. 61192" would necessarily be a purchase with funds derived from the sale of public utility certificates authorized by that ordinance, here was a clear indication that the parties intended a special fund contract. We rejected that construction and held that the word "other" in the title of the ordinance was used by the Council in the sense of "not the same; different"; but we characterized these terms in the title as "contradictory" and "ambiguous", as indeed they are. But, in the light of the evidence now before us, we think there can be no room for the contention that the Council intended, or that the Market Company understood that it intended, by the enactment of this ordinance, to commit the City to a general obligation or to authorize the city attorney to prepare, and the mayor and auditor to execute, a contract containing a provision for such an obligation.

Recurring now to the drafts prepared by Mr. Farrens prior to October 9, 1931, attention is called to the rather unusual form in which the agreement to pay the purchase price is cast. It is not provided that the obli-

gation in the first instance shall be a general one, but that it is to become a general obligation in default of payment at the time agreed upon. The reply brief of the appellants says of this provision:

"The record has no explanation of the purpose of the Market Company's attorney in adding these words to a provision which already stated an unqualified obligation to pay the purchase price in cash. It may be assumed, however, that at this time the question whether the City's obligation was to be general or limited was considered an open one, and that a proposal to limit the payment to the special fund in the first instance was anticipated; hence the precautionary clause that failure to make the payment when due would transform the obligation into a general obligation payable from general funds."

Thus, we have it from counsel for the Market Company that the correct interpretation of the language employed by Mr. Farrens is, that the purchase price when due should be paid out of the proceeds of the sale of public utility certificates, but, in the event of the City's default, the obligation would become a general one. If this interpretation be correct, and we think it is, then it follows as a reasonable inference that, when the Market Company proposed a contract which eliminated the general obligation provision of Mr. Farrens' drafts, it knew that it was proposing a special fund contract.

The Market Company, as we have stated, takes the position that it was not seeking a general obligation contract. It says that it would have been content with a special obligation contract, but that the City itself elected to assume a general obligation as the only alternative to the plaintiff's refusal, as stated in its brief, "to accept a contract limiting the source of payment to a special fund without a commitment by the City to

create the fund and have the money available for the payment upon completion of the building and tender of the property." "To avoid making this commitment", the brief continues, "and for the purpose of retaining control of the time when and the price at which the securities would be sold, the City abandoned the plan of incorporating in the contract with plaintiff a restriction as to the fund from which the consideration for the market property would be paid." Three of the commissioners, it is said, were unalterably opposed to a sale of certificates at a price less than 90. The Market Company flatly rejected this condition, and the difficulty was resolved by the City's tender of a general obligation contract.

This position, that the proposal for a general obligation came not from the Market Company but from the City, is one to which the Market Company is driven by the facts of the case. It could scarcely argue with any hope of success that, after it had accepted the condition laid down by Mayor Baker and had been awarded the contract, it demanded an agreement of an entirely different character than that which it had expressed its willingness to accept. The onus of change of position must be placed upon the City.

The plaintiff says that it required an agreement "to create the fund and have the money available for the payment upon completion of the building and tender of the property." When counsel for the plaintiff was asked from the bench on the oral argument to explain the difference between such an agreement and a general obligation agreement the following response was given:

"The Market Company would be assured of its money, but there is this essential difference. The parties recognized that the certificates might not be salable at once and they provided, and this was in

the final draft, they provided for interest, and it was anticipated that if there was delay in selling the certificates and getting the price the City should pay interest quarter-annually during that period of delay. I think there is a serious difference between a general obligation contract and a contract obligating the City in good faith to put out utility certificates which both sides believed to be salable. This may answer your question. If, after a good faith attempt to sell the certificates, based upon a good faith intention to operate the market, if the certificates could not be sold, the contract could not be performed, but always there would be required a good faith effort to put out certificates and sell them.''

We are unable to see that there is any difference between the expression used in the plaintiff's brief and thus explained by its counsel on the argument and the demand in Mr. Farrens' letter to Mr. Grant that the City proceed upon the theory that the Public Market Company would be paid in cash and that the City would realize this cash by issuing, advertising and selling its own certificates. Mr. Farrens was objecting to the City's proposal that the Market Company buy the certificates at 90, and, since the original plan to pay the consideration with certificates had been abandoned, he was insisting that the Market Company be paid in cash, and without any requirement that the Market Company in effect should supply the cash by agreeing to bid in the certificates at 90. He nowhere, either expressly or by implication, suggested that if the cash could not be obtained through the sale of certificates the City would be required to pay from some other source. Mr. Farrens was talking about a special fund contract and nothing else, the same kind of contract which counsel for the plaintiff dwelt upon in their brief and on their oral argument, a contract for the payment of the considera-

tion out of the proceeds of the sale of public utility certificates and which would not bind the City to pay the purchase price if the certificates could not be sold "after a good faith attempt to sell the certificates based upon a good faith intention to operate the market." These statements, it seems to us, accord precisely with the contentions which the plaintiff has advanced in this court.

Now, the significant thing with reference to all this is, that Mr. Farrens enclosed with his letter a redraft of Mr. Grant's Section 6, which omitted the general obligation clause of Mr. Farrens' previous drafts, and which was accepted by Mr. Grant and incorporated into the contract as executed. The section, as so redrafted, must, therefore, be taken as Mr. Farrens' method of giving expression to the kind of an agreement that he said the Market Company wanted. Mr. Grant was warranted in so viewing it and must have so viewed it when he accepted it, taking the precaution, however, to add to the contract the express references, heretofore mentioned, to the ordinances which lie at the foundation of the whole transaction. In those circumstances the plaintiff is in no position to assert that the language which its attorney and representative used means something different from that which Mr. Farrens' letter, by clear implication, said it was intended to express.

While it is true that three of the city commissioners objected to the sale of the certificates for less than 90, two of them, Messrs. Barbur and Mann, voted for the execution of a contract which contained no such restriction, although stating at the time that they reserved the right to vote against the sale of certificates at a discount of more than 10 per cent. Obviously they could not by such a statement affect the right of the Market

Company, under the contract, to compel the City to sell and issue the certificates and, if possible, create the fund. Obviously, also, they were thinking in terms of public utility certificates and not in terms of a general obligation, and the representatives of the Market Company who were present must have known this. The third commissioner, Mr. Clyde, voted against the ordinance and moved that "a section be inserted in the agreement providing that the payment be made from the sale of utility certificates to be conditioned that the utility certificates be sold at a discount of not more than 10%." His motion received no second. The refusal of the rest of the Council to support it cannot be taken, in our opinion, as meaning that they were opposed to a special fund contract, but only that they saw no necessity for any mention of the matter beyond that contained in the references to the ordinances and were unwilling to place in the contract the restriction on the sale of certificates which the motion contemplated.

The whole argument for the plaintiff, however, rests upon the proposition that the desired restriction on the sale price of the certificates was an obstacle in the path of final agreement which was surmounted or evaded by resort to a general obligation. We think that proposition is not in accordance with the facts as just stated and is inherently improbable. We are asked to believe that two commissioners, who were unwilling to enter into a contract payable from the proceeds of public utility certificates except on condition that the certificates must be sold for 90 or better, were willing to enter into a general obligation contract, leaving the City to take its chances of reimbursing the general fund by the sale of certificates.

We are further asked to believe that although there is not a shred of evidence nor any contention that anyone, either Mr. Farrens, Mr. Grant or anyone else, ever suggested to any commissioner that the position of the City with respect to a general obligation contract was to be reversed, and, although there was no public discussion of such a complete about-face, at the last moment, as the result of an understanding between Mr. Grant and Mr. Farrens, the City Council repudiated the policy theretofore publicly announced and proceeded to do what it had solemnly declared it would never do. In our opinion both propositions are on their face too unreasonable to be accepted by this court.

■ The evidence leads, in our opinion, to the conclusion that this contract was one for the payment of the purchase price of the market out of a special fund and was not intended to impose a general obligation on the City. The whole scheme for a public market was built around the public utility certificates ordinance, and the record, practically from beginning to end, is shot through with evidence that the sale of the certificates was to be the sole means of financing the project. Thus, for example, a disinterested witness, called by the plaintiff, testified that at the meeting in the mayor's office on October 22, 1931, the general tenor of the discussion was that the public market must be financed from a special fund created by utility certificates and not otherwise, that the parties were in accord that it was not to be a general obligation against the City, and that the same thing was true of the subsequent meeting on October 24, 1931. The transaction had its beginnings and the contract was consummated during a time of economic and financial distress when the City of Portland was seeking out means to solve a grave unemploy-

ment problem without adding further to the burdens of the taxpayers, many of whom were unable to pay the taxes for which their property was then liable. The City had no funds with which to pay nearly one and a half million dollars for a market, and its Council, when entering into this contract, made no provision for the raising of this not inconsiderable sum, save through the public utility certificates issue. Where was the money to come from if not from this source? Where did the representatives of the Market Company think it was coming from? According to the record they were not sufficiently interested to inquire, and the only answer to these questions is found in the suggestion that the City could have resorted to "temporary financing"; that is, it could have borrowed the money for such time as it might take to dispose of the certificates. Mr. Farrens testified that he made the suggestion to Mr. Grant, but he did not testify that Mr. Grant acceded to it. There is no evidence that any member of the Council ever heard of it. Mr. Grant, as a municipal lawyer of long experience, would no doubt have seen at once that such a method of proceeding would raise a legal question and probably lead to litigation, for Ordinance No. 61192 did not authorize the City to issue public utility certificates to provide funds with which to pay off a loan, but "to provide funds for the purpose of purchasing and establishing a public market". It seems to be thought that temporary financing was the only procedure possible because it was necessary for the City to have acquired title to the market property before it could issue the certificates; but we see no reason why the transaction could not have been handled—as the evidence shows it could have been—by an exchange of documents and funds placed in escrow in the same manner as these things are done in the City of Port-

land and elsewhere every business day in the year. Certainly, whatever may have been their hopes and expectations, everyone connected with the transaction realized that there was more or less uncertainty as to whether the certificates could be sold at a satisfactory price; three of the commissioners were so much of this opinion that they asked for a guaranteed bid from the Market Company; and it must be that the Market Company's bankers were skeptical, because they did not finance the project, and the Market Company was unable to proceed until it got the loan from the RFC, a government corporation expressly authorized to finance "self-liquidating" projects. We are inclined to the opinion that Mayor Baker was not far wide of the mark when he testified that at the time of this transaction "it would be just pure insanity to have advocated any moneys for any other purpose than absolutely operation of the City and its obligations", and that every City official and every responsible business man in the City must have been aware that this was true. We have not the slightest doubt that counsel for the plaintiff are right when they say that the Market Company did not seek a general obligation from the City—at least, after October 9, 1931,—and we are constrained to hold under the evidence that they did not get it.

The provision in the contract for the payment of interest on "all payments due from the City to the Company hereunder, if unpaid when due", tends to negative the idea of a temporary loan to be obtained by the City. This provision was inserted at the suggestion of Mr. Farrens, to take the place of the provision in Mr. Grant's draft that the City should have 90 days from the time of tender of proper conveyances by the company in which "to create said fund by the sale of

public utility certificates as authorized by Ordinance No. 61192'', and that any sums due thereafter should bear interest. Mr. Farrens' objection to this provision, as stated in his letter, was obviously an objection to the delay in making payment, a delay which he thought was unnecessary, because, he said, ''the City can very readily keep track of the progress of the work and during the last 90 days prior to completion can make the necessary advertisements'' (i. e., of the sale of public utility certificates). So, in his redraft of Section 6, he provided for interest from the date that the payments were due, plainly, as it seems to us, because of the knowledge that both sides had that the City might not be able to create the fund by the sale of certificates at once and might find it necessary to re-advertise before obtaining a satisfactory bid. Mr. Grant made the concession at Mr. Farrens' request, but it was a concession which went no further than to fix an earlier date from which interest should begin to run.

We come now to certain evidence introduced on behalf of the City and controverted by the Market Company. It can be best stated by the following excerpt from the opinion of the circuit judge:

''The evidence is overwhelming that on the day the contract was signed and before its signing and at a meeting of the Council when the mayor was present, the members of the Council, the city attorney, the president of the Market Company, and the attorney for the Market Company, and a large representation from the citizenry of Portland, the question was raised as to what the contract meant, and some interested citizens of Portland stated the belief that the contract might be construed as imposing a general obligation upon the City of Portland. Whereupon, Mayor Baker at that time openly asked the city attorney whether or not there was

any danger of it being so construed, and that he wanted to know before he would vote for the adoption of the contract as to whether there was any possibility of it being successfully contended that the City of Portland would be obligated upon a general obligation, and, in response to such question, the city attorney stated that it could not be construed as a general obligation and could only be held to be a special obligation, and gave as his reasons that the proposed contract was so intimately tied up with the ordinances providing for the purchase of the property by the sale of public utility certificates that no other method of payment could be used except the method provided in Ordinances Nos. 61192 and 61566. Mr. Wilson, the president of the Market Company, and also Mr. Farrens, the attorney for the Market Company, were both present at that time that Mr. Grant made his statement, and no word of opposition was uttered by either or any of the representatives of the Market Company, and the meeting adjourned with apparently every one having the belief and understanding that the statement of Mr. Grant was correct and that such was the understanding of all the interested parties. Nothing to the contrary was shown either by the record or otherwise. Mayor Baker and the councilmen went on their way in the full belief that they had authorized the signing of a contract which provided only for payment by public utility certificates.''

■■ Witnesses for the Market Company deny that these things took place on October 28, 1931, the day on which the Council authorized the execution of the contract, and it is argued that the witnesses for the City confused the matter with a similar incident which occurred on April 13, 1933, at the time that the Council adopted a resolution approving the assignment of the contract to a trustee for the RFC. The Market Company's argument is based largely on the fact that the

minutes of the meeting of October 28, 1931, fail to record the incident, while from the minutes of the 1933 meeting it does appear that Mr. Frank Hilton, an attorney, objected to the adoption of the resolution until he could investigate the question of the character of the City's obligation under the contract. The omission of this matter from the minutes of the meeting of October 28, 1931, is, of course, not conclusive, although it is a circumstance to be considered in assessing the evidence. But, in our opinion, a far more weighty factor for the guidance of this court is that the circuit judge, who saw the witnesses and heard them testify, believed the witnesses for the City. This court has so often in equity cases deferred to the findings of the trial judge on close questions of fact, because of the immense advantage he has over us in determining the credibility of witnesses, that it is unnecessary to cite the decisions. A recent decision is *Page v. Thomas Kay Woolen Mill Co.,* 168 Or. 434, 123 P. (2d) 982. In this instance the findings were made by a circuit judge of long experience who gave the closest attention to the testimony. We accept them. They demonstrate that the representatives of the Market Company were fully advised that the City, in entering into the contract, understood that it did not provide for a general obligation but only for payment out of a special fund. By § 2-222, 1 O. C. L. A., it is provided: "When the terms of an agreement have been intended in a different sense by the different parties to it, that sense is to prevail, against either party, in which he supposed the other understood it * * *." Whatever the representatives of the Market Company may have understood the contract to mean, the evidence now under discussion shows that they knew the members of the City Council understood that it was not intended to be an agreement imposing a general

obligation on the City, and, under the foregoing section of the statute, it is our duty to construe the contract accordingly.

There is another piece of evidence, which we deem relevant and important.

In April of 1932 one Walter W. Whitbeck filed a suit in equity in the circuit court for Multnomah county to obtain a decree enjoining the City and the Market Company from performance of the contract on the ground, among others, that it imposed on the City a general obligation which increased the indebtedness of the City beyond the amount limited by the charter and therefore was void.

In its answer to the amended complaint in this case the Market Company denied allegations to the effect that the contract imposed a general obligation on the City and an allegation that the Market Company did not by the terms of the contract "promise or agree to look to or depend upon the money or funds to be derived from the sale of said public market utility certificates as or for its compensation". By this pleading the Market Company raised two issues, namely, that the contract was not a general obligation contract and that, even if it were to be so construed, the debt limitation was not exceeded. Moreover, it is shown without contradiction and practically admitted in the testimony of the president of the Market Company, Mr. C. Lee Wilson, that on the trial the attorney representing the Market Company stated in argument, in response to a question by the presiding judge, that the obligation created by the contract was not a general obligation of the City but a special obligation to be paid by utility certificates. The City, in the litigation, took the same position as the Market Company.

The pleadings filed by the City and the Market Company are practically identical in form and substance. The City filed a brief on demurrer to the answer, in which it stated that the contract did not create a general obligation ''and the Company's attorneys (of whom Mr. Farrens was one) interpret the contract in the same manner, as the court will remember at the oral argument on this demurrer''. The Market Company's brief said on this point: ''It is not necessary in order to sustain the answer of defendant to determine the nature of the obligation created by the contract and the ordinance. The answer does not show the debt limitation to have been increased''. The circuit judge, in dismissing the Whitbeck case after a trial, made findings of fact, among which was one to the effect that the contract was not a general obligation contract, but that the purchase price of the market was payable only from funds to be derived from the sale of public utility certificates. These findings appear to have been prepared in the office of the Market Company's attorneys.

Although counsel for the plaintiff question the accuracy of the evidence as to the statement made by the Market Company's attorney in open court, we see no reason to doubt it. The attorney to whom the statement was attributed was not called as a witness by the Market Company to deny it. The statement was wholly consistent with what appears to have been the position taken by the Market Company as disclosed by the record evidence in the Whitbeck case before us. The Market Company's attorneys must have known the contents of the City's brief from which we have quoted, but, so far as appears, they did not take issue with the statement of their position there made. In our opinion, we are warranted in drawing the conclusion

from this evidence that the Market Company, in solemn and deliberate fashion, in litigation arising before construction of the market building had commenced, placed an interpretation upon the contract which it now repudiates. This interpretation, adopted by both parties before controversy had arisen between them, "is entitled to great, if not controlling, influence in ascertaining their understanding of its terms". 12 Am. Jur. 787, § 249; *Condit & Conser, Inc., v. Moon Motor Car Co.,* 129 Or. 161, 168, 276 P. 265.

There is nothing in the record to explain, and this court is unable to understand, why, in a matter of such large importance, with competent, experienced lawyers acting for the parties, their intention with respect to so vital a provision of the contract should have been left open to doubt and controversy, when, by the use of not more than a dozen words, they could have rendered their meaning unmistakable. Had the contract provided that the agreement to pay the purchase price "shall not be a general obligation of the City of Portland" or had it provided "that it shall be a general obligation of the City of Portland" this dispute would never have arisen. For reasons not disclosed this or some similar course was not taken, and the question of what the parties intended must be determined in the light of all the relevant facts.

In reaching the conclusion which we have announced, the court has not overlooked the argument of the plaintiff based upon the abandonment by Mr. Grant of the alternative provisions drafted by him which expressly limited payment of the purchase price to a special fund. The contention that this action, together with the language of Section 6 as finally agreed upon, manifests an intention on the part of the City to

assume a general obligation is certainly not lacking in persuasive force. It might be said to balance the argument based upon Mr. Farrens' abandonment of the express words of general obligation in the draft prepared by him. But the other evidence makes it reasonably certain, in our opinion, that the references in the contract to the public utility certificates ordinance were accepted by the parties as a method of indicating the source to which the Market Company must look for payment of the agreed purchase price.

■ In any event, whatever doubt there may be concerning the correctness of this conclusion must be resolved in favor of the special fund view, for a reason now to be discussed. It is the court's duty to place such construction upon the contract as will render it legal and enforceable rather than void. *Keady v. United Railways Co.*, 57 Or. 325, 100 P. 658, 108 P. 197; *Arment v. Yamhill County*, 28 Or. 474, 479, 43 P. 653. The City, by its answer, has raised the question of the validity of the contract if construed as a general obligation, and asserts that so construed it is *ultra vires,* in view of Section 193 of the charter of the City of Portland, Recodified Charter 1942, Section 7-102, which provides:

"No money shall be expended or payment made from any fund of the City, except assessment funds, until a specific appropriation shall be made therefor and an ordinance making an appropriation of money shall not contain a provision on any other subject. * * *

"Any liability or liabilities incurred by the Council to be paid in any fiscal year, which singly or in the aggregate shall be in excess of the revenues for such year shall be null and void.

"* * * and the Council shall not authorize any expenditures during any fiscal year, nor shall any liability or liabilities be incurred by or on ac-

count of the City of Portland, to be paid in any particular fiscal year (for the payment of which approval of the Council shall be necessary) which singly or in the aggregate shall be in excess of the revenues received during such year, applicable or made applicable by transfer to the payment of such liability or liabilities. Nothing contained in this Charter shall authorize the enforcement against or collection from said City, on account of any debt, contract or liability, of any sum in excess of the limitations prescribed in this Section.

"The City shall issue no warrants or other evidences of indebtedness, except upon special assessment funds, and the payment of judgments against the City, unless there is money in the treasury duly appropriated and applicable to the payment of the same on presentation, and all evidences of indebtedness issued contrary to this provision shall be null and void. * * *"

In our former opinion we held that the City is authorized by Section 151 of the charter to contract by a general obligation payable out of the City's general fund for the purchase of a public utility (160 Or. 165). We did not, however, pass upon the question whether the contract here involved, if so construed, violates Section 193, because we had before us only the complaint which disclosed nothing as to the revenues of the City.

The fiscal year of the City commences on December 1 of each year and ends November 30 of the year following. The contract was entered into in the fiscal year 1931, and was to be fully executed July 15, 1932, at which time the purchase price became payable. It now appears that no provision, either by tax levy or otherwise, was made for revenues out of which to discharge this liability, and there were in fact no such

revenues either in the year in which the liability was incurred, in the following year when it was to become payable by the terms of the contract, or in 1934, when the contract was fully performed by the Market Company. As we have already seen, the City, with difficulty, was able to pay its ordinary operating expenses.

Section 193 provides:

"Any liability or liabilities incurred by the Council to be paid in any fiscal year, which singly or in the aggregate shall be in excess of the revenues for such year, shall be null and void."

■ Similar provisions are found in the constitutions of a number of the states, and it is frequently provided that the limitation based upon revenue may be exceeded upon securing the assent of a specified number of the voters. See, Rev. Vol. 6, McQuillin, Municipal Corporations (2d Ed.) 10, § 2365; 1 Dillon, Municipal Corporations (5th Ed.) 409, § 210; 38 Am. Jur., Municipal Corporations, 112, § 425. Referring to such provisions, Judge McQuillin says, *ibid.*, 2365:

"These provisions require municipal corporations to adopt the safe, sane and conservative plan of pay-as-you-go; consequently each year's income and revenue must pay each year's indebtedness and liability and no indebtedness or liability incurred in any one year shall be paid out of the income or revenue of any future year."

Professor Dillon says (*ibid.*, 411, § 210):

"The purpose of these constitutional provisions is *to limit the expenditures in any given year* to the amount of the revenues and income of the municipality provided for such year, unless the voters enlarge the limit."

■ And he refers with approval to the opinion of Beatty, C. J., in *Higgins v. San Diego Water Co.*, 118 Cal. 524, 45 P. 824, 50 P. 670, in which it is said:

"A city cannot incur valid obligations to pay any more than its revenue already provided will enable it to pay. The moment it oversteps that mark its contract ceases to be valid, and it cannot pay the claims founded upon such invalid contracts. It is under a legal obligation not to pay them."

It is asserted by counsel for the appellants that the rule of these authorities does not govern Section 193 of the Portland charter, but applies only where the constitution, statute or charter provides that no municipality shall incur indebtedness in any one year in excess of the income and revenues provided for such year. It is said that "in Section 193 no obligation is imposed with respect to keeping the obligation *incurred* in any particular year within the revenue of *that* year or within any limit definitely ascertainable at the time when obligations are incurred". If this be true, then, of course, the provision has no meaning or effect whatever. We think that it is not true.

■ The provision means, in our opinion, that liabilities incurred in a particular year, which exceed the revenues provided for the year in which they are to be paid, are null and void. The words "such year" in the phrase "revenues for such year" refer obviously to the fiscal year in which the liability is "to be paid", which is not necessarily the year in which it is incurred. In this view, Section 193 is broader and more comprehensive in its terms than similar provisions from other jurisdictions which refer only to the year in which the liability is incurred, for the Portland charter provision covers the case of a liability to be paid in the same year

in which it is incurred as well as the case of a liability incurred in one year and to be paid in a future year. If, therefore, the liability assumed in the contract with which we are here dealing had by its terms been made payable in 1931, the year of its execution, the liability thus incurred would without doubt have come within the rule of the authorities cited. Moreover, under these provisions from other states, as counsel concede in their brief, "contracts undertaking to create obligations beyond the prescribed limit are invalid, even though payment out of the revenues of succeeding years is intended". To this effect they cite the annotation in 41 A. L. R., p. 806, where it is said, citing *Muir v. Murray City*, 55 Utah 368, 186 P. 433, that if the full amount is to be raised and can be paid in the year in which the contract is made, there is no objection to stipulating that the payment is to be made at a later date. The text proceeds:

"The question of the power of a municipality, under a restriction of this sort, to incur a liability and stipulate that it is to be paid out of the revenues of subsequent years, arises most frequently in the case of a liability which is to be paid in instalments. According to the majority view, such a provision prohibits a municipality from assuming an indebtedness which is to be paid in instalments falling due in future years, if the total amount exceeds the revenue for the year in which the liability is incurred. The fact that each instalment as it falls due may be within the revenue of the year in which it is payable does not alter this."

The foregoing statement, which is supported by citation to numerous cases, accords with our own holdings. In construing a charter limitation upon the amount of indebtedness which a city may assume (a restriction akin to that found in Section 193, *Van-*

*degrift v. Riley,* (Cal.) 16 P. (2d) 734), this court held in the early case of *Salem Water Co. v. City of Salem,* 5 Or. 29, that a contract to pay a sum of money in instalments was void if the total amount of the contract exceeded the limitation, notwithstanding the amount of each yearly instalment was within the limitation. The doctrine of this case was approved and a like decision rendered in *Brewster v. Deschutes County,* 137 Or. 100, 1 P. (2d) 607, involving the application and construction of Article XI, Section 10, of the Constitution, which places a limit on county indebtedness; and a dictum to the contrary in *City of Joseph v. Joseph Water Co.,* 57 Or. 586, 111 P. 864, 112 P. 1083, was overruled. See, also, *Coulson v. City of Portland,* 1 Deady 481, 6 Fed. Cas. No. 3,275. In *Multnomah County v. First National Bank,* 151 Or. 342, 350, 50 P. (2d) 129, the Deschutes County case and similar cases were distinguished, and the contract sustained because provision had been made for its payment by the levying of taxes. It was held that no indebtedness had been created since "it is merely an anticipation of the collection of taxes already levied".

Section 193 speaks of "liabilities", a broader term than "debt". It includes "any kind of debt or liability, either absolute or contingent, express or implied". *Salem Water Co. v. City of Salem,* supra; *Brewster v. Deschutes County,* supra. See, *Cochran v. United States,* 157 U. S. 286, 15 S. Ct. 628, 39 L. Ed. 704; *Straughan v. Coeur d'Alene,* 53 Idaho 494, 24 P. (2d) 321; *Washington Water Power Company v. City of Coeur d'Alene,* 9 Fed. Supp. 263, 271; *State ex rel. Hannibal v. Smith,* 335 Mo. 825, 835, 74 S. W. (2d) 367; 17 C. J., Debt, 1377, § 2. The contract obviously created a liability. No revenues for its payment were

provided or were ever available, and, in our opinion, therefore, the assumption of liability, if intended to be a general obligation, was a clear violation of the charter provision.

We concur in the appellants' view that the question of the validity *vel non* of the contract must be determined as of the time when the indebtedness or liability is incurred. If that be so, then the only conceivable test of validity under Section 193 is whether at that time revenues for payment of the liability have been provided. There is no objection, legal or otherwise, that we know of to making such provision in one year for the payment of a debt in a future year, *Muir v. Murray City*, supra; and we agree with the statement in the dissenting opinion of McCulloch, C. J., in *Kirk v. High,* 169 Ark. 152, 273 S. W. 389, 41 A. L. R. 782, that ''the term 'revenue from all sources for the fiscal year' is broad enough to include accumulated surplus''. The contention of the appellants that the liability is enforceable notwithstanding no revenues have been provided for its payment, because it later becomes the duty of the Council to make such provision by tax levy, if other resources are not available, cannot be sustained. Under that view Section 193 would be meaningless. No contract would offend against it, and the Council would be left wholly free from restraint in incurring indebtedness, save for the limitation imposed by Section 60, Recodified Charter 1942, § 10-105, on the amount of indebtedness which may be incurred for the acquisition of a public utility. If the appellants' argument is not intended to apply to liabilities incurred and payable in one and the same year, still, if their position were to be sustained, the Council could always avoid the limitation by the simple device of postponing the

time of payment to a future year. We think that Section 193 was intended to have some effect in limiting the powers of the City Council in the incurring of indebtedness and that it is the court's duty to give it effect according to the meaning of the words used.

The appellants quote the following from *Wyckoff v. Force,* 61 Cal. App. 246, 214 P. 489, 490:

> "Section 18 of Article XI of the Constitution merely prohibits the incurring of an indebtedness exceeding in any year the income and revenue provided for such year. It does not require that the money be on hand at the time that the indebtedness is incurred, or, in fact, that the income should have been provided at that time. It is sufficient if the indebtedness is within the income which has been provided or which will, in the ordinary course, be provided within the year."

It should be first observed that the decisions in California are not in harmony with those of the courts of other states. It is there held that "a person contracting with a city at a time when the revenues of the year are amply sufficient to satisfy the amount payable to him does not obtain any right or priority over other persons whose claims are payable from that year, even if they be contracted after the indebtedness to him is incurred. He takes the risk that at the time when he is able to enforce payment of his claim the revenues of the year shall not have been expended for other legitimate expenses of the year." I Dillon, Municipal Corporation (5th Ed.) 412, § 210. As Judge Dillon points out at page 414, *ibid.,* this doctrine was criticized, and in his opinion justly so, in *Higgins v. San Diego Water Co.,* supra, where it is said that a city cannot incur valid obligations to pay more than its revenue already provided will enable it to pay.

However that may be, we think the cited case gives no aid to the appellants. A school board had agreed to pay the plaintiff, an architect, for his services in preparing plans and specifications for a school building and in supervising and superintending the construction thereof the sum of $20,000 "payable in indefinite instalments from time to time as said work progressed until said work was fully completed". The contract was entered into May 11, 1920. The action was in mandamus to compel the payment of an order for $7,000 in part payment of the agreed price, drawn by the trustees of the school district. After using the above quoted language, the court said that the evidence showed that there was over $20,000 remaining in the high school fund at the time of the trial, March 20, 1932, and that the estimated balance at the close of the fiscal year, after paying all claims including $5,000 in warrants already drawn, would be about $13,000. This was held to be sufficient to sustain a finding that the order did not exceed the income provided for the fiscal year following July 1, 1921, the day upon which it was drawn. But, after saying that the date of the order was of little importance, the court proceeded:

"The trial court found, and the evidence supports the finding, that respondent's contract called for his services until the building was completed, payments to be made from time to time as the work progressed. It does not appear that any instalment coming due in any year during the life of the contract was in excess of the income and revenue of that year. The contract is not, therefore, within the inhibitions of section 18 of article 11 of the Constitution".

If a like interpretation is to be placed on Section 193 then it follows that this contract would be void as a gen-

eral obligation contract, because the evidence here shows that at the time the purchase price became due there was no income or revenue whatever available for its payment.

Asserting that the utmost possible effect of Section 193 upon contracts that impose obligations to be paid in future years is that such obligations shall be limited to such an amount as may reasonably be expected to be within the revenues of the City for the fiscal year in which payment shall fall due, counsel for appellants argue that this test has been met by providing the necessary revenues through the proposed sale of public market utility certificates.

The question presented by this contention is whether the possibility of creating the necessary fund for the liquidation of the indebtedness by the sale of public market utility certificates, payable only out of the revenues of the utility, constitutes revenue reasonably to be expected within the meaning of the charter provision. The term "revenue" is thus defined in *Commonwealth v. Brown,* 91 Va. 762, 21 S. E. 357, 363, 28 L. R. A. 110, "the income which a state collects and receives into its treasury and is appropriated for its payment of its expenses". In *Davis v. Phipps,* 191 Ark. 298, 85 S. W. (2d) 1020, 100 A. L. R. 1110, 1113, it is said:

"When we refer to the revenues of the state, we usually mean the annual or periodic yield of taxes, excise, customs, etc., which the state collects and receives into the treasury for public use, but the word 'revenues' may be much broader than that as it may include rent, yield, as of land, profit. It includes annual and periodical rent, profits, interest, or issues of any species of property, real or personal, income. The yield from taxes is one of the last meanings given in Webster's International Dictionary, yet it is the one with which we have most to do in questions such as are presented here."

■ Obviously the word "revenue" as used in these provisions cannot mean the actual money which shall be received in the City treasury, but it was the estimated revenues which the lawmakers had in contemplation. See *Babcock v. Goodrich*, 47 Cal. 488, 513. The estimates, however, must relate to sources of income which are definite and certain and not contingent. *Overall v. City of Madisonville*, 125 Ky. 684, 695, 102, S. W. 278, 12 L. R. A. (N. S.) 433; *Rice v. City of Milwaukee*, 100 Wis. 516, 521, 76 N. W. 341; *State ex rel. Umatilla County v. Davis*, 161 Or. 127, 85 P. (2d) 379, 88 P. (2d) 314; See, 1 Dillon, Municipal Corporations (5th Ed.) 415, § 21. The first of the cited cases involved the construction of a constitutional provision which prohibited a municipality from becoming in debt "in any manner or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of two-thirds of the voters thereof, etc." Uncollected fines and licenses were held to be too uncertain and indefinite to be estimated in the beginning of the year as part of the income of that year. In *Rice v. The City of Milwaukee,* supra, there was a similar ruling as to a street railway tax or a license, the amount of which depended upon the earnings of the railway. The case involved a constitutional limitation on indebtedness of five per cent of the assessed valuation of the city, and the court said, in answer to the argument that revenues for the purpose of meeting the proposed indebtedness has been already provided, that only "such revenues as the corporation had levied, and had a legal right to enforce, regardless of any one's will or pleasure" could be considered. In the Umatilla County case this court held that delinquent taxes may not be considered as assets of a county for the purpose of determining whether the debt limitation prescribed by Arti-

cle XI, Section 10, of the Constitution had been exceeded. It would seem to be an anomaly to hold that the Council had provided revenues for the payment of a general obligation enforceable against the general fund by the hope or expectation of raising the necessary moneys to meet the indebtedness through the sale of certificates payable only from the profits of a new and experimental public utility.

In *Rorick v. Dalles City*, 140 Or. 342, 12 P. (2d) 762, this court held that a statute placing a limit upon the bonded indebtedness of a municipality could not be evaded by a provision that the principal of the bonds should be paid solely from the tolls of a bridge (to finance the construction of which the bonds were to be sold), while payment of interest was made a general obligation of the City if the fund derived from the bridge tolls should be insufficient to pay interest after payment of the cost of operating, repairing and maintaining the bridge. It was contended that the liability to pay interest was only contingent and, therefore, not an indebtedness within the meaning of the statute; but the contention was rejected, the court saying, among other things, that, since it was impossible to ascertain the amount which the bridge might earn over and above the cost of operation and maintenance and there was no way, therefore, of determining whether the bonds would ever be paid, the obligation might continue until from general taxation or some other source the City would be compelled to pay off the principal in order to get rid of the duty of paying the interest.

There, the uncertainty as to the adequacy of the alternative source of payment was held to nullify the claim that no general indebtedness had been incurred by the City. Here, for a like reason, it must be held that

no provision, such as it contemplated by Section 193 of the charter, was made by the City Council for the discharge of what is *ex hypothesi* a general indebtedness, for not only could it be foreseen at the time the contract was executed that the sale of the certificates would be dependent on many factors, including the condition of the securities market and the opinion of investors as to the probability of success of the venture—to say nothing of the local political situation, as this case illustrates; but the event has demonstrated the unwisdom of a ruling which would approve resort to such a device as a substitute for the requirement of "revenue" to meet liabilities as contained in the charter provision.

It is urged, however, that the Council must be permitted a wide discretion in determining what constitutes revenue, and in support of this view we are referred to the cases of *Spears v. City of South Houston*, 136 Tex. 218, 150 S. W. (2d) 74, and *Johnson v. Ferguson*, (Tex. Civ. App.) 55 S. W. (2d) 153, 158. It is doubtful whether that principle has any application to a case where, as here, the Council has never included the obligation or the supposed revenue in any of the estimates which are required to be prepared in making up the annual budget preparatory to the levying of the annual tax. (See, Charter, Sections 186 to 190, inclusive; Recodified Charter, 1942, Sections 7-107 to 7-110, inclusive). It would be difficult to say that in those circumstances the Council had ever undertaken to exercise any discretion whatever in the matter. If, however, it had done so in the manner suggested, we would be prepared to say, in accordance with the rule of the authorities which we have cited, that reliance by the Council on uncertain and indefinite sources of income would constitute an abuse of discretion. There is nothing to the contrary in the Texas cases cited by counsel.

■ We think it was one of the clear purposes of the people in enacting Section 193 to prevent the Council from incurring obligations payable in a future year, while leaving it to future Councils to find the money to discharge them. This is the very result which would follow should the court yield to the contention of the appellants on this point. Within the meaning of the charter provision, in our opinion, no revenue has ever been provided or been in existence to pay the purchase price of the market property; and it follows that were we to construe the contract as one imposing a general obligation on the City we should be compelled at the same time to declare it null and void. Since, as has been shown, there is ample support in the record for a different construction, under which the contract will be saved rather than destroyed, that is the construction which we must necessarily adopt in obedience to the well established rule to which attention has already been called.

■ It should be added that our decision as to the meaning and effect of Section 193 is limited to cases involving extraordinary expenditures such as contracts for permanent improvements. In determining what are debts and liabilities within the meaning of restrictive provisions of this character, the courts have drawn a distinction between such contracts and those for the ordinary running expenses of a city or other municipality. See, *State ex rel. Umatilla County v. Davis*, 161 Or. 127, 144, 85 P. (2d) 379, 88 P. (2d) 314; *Windsor v. Des Moines*, 110 Iowa 175, 190 81 N. W. 476, 80 Am. St. Rep. 280; *Monroe County v. Strong*, 78 Miss. 565, 575, 29 So. 530; 1 Dillon, Municipal Corporations (5th Ed.), 423, § 211. We intimate no opinion as to what view should be taken were we dealing with a contract of the latter type.

(b) *Meaning of the phrase "going public market utility"*.

By Paragraph 8 of the contract the Market Company agreed to perform a leasing service for the procuring of tenants for the market building and "that before the City acquires said public market building it shall be so occupied as to be a going public market utility".

The City alleged in its answer that the plaintiff "failed and neglected to obtain such leases and rentals of said buildings as to constitute the same a going public market utility". The phrase, "going public market utility", it is contended, "means that the operation shall be on a basis that will not only cover operating expenses but also provide for depreciation, upkeep, maintenance, and sufficient profit to induce investment." As this alleged promise was not fulfilled, as indeed the market has never been operated at a profit, it is urged that the Market Company failed to perform its contract and should be denied any relief whatever.

■ For a number of reasons we think that the position of the City is untenable. No authority has been cited which supports the construction insisted upon. The phrases, "going concern" and "going business", which are analogous to that used in the contract do not, under the decisions of this and other courts, connote a business which is making net profits. As applied to a newly established business they are held to mean "an established business and acquired customers". *Pennsylvania R. Co. v. Public Utilities Commission of Ohio*, 116 Oh. St. 80, 155 N. E. 694; *American Woodworking Machinery Co. v. Agelasto*, 136 Fed. 399, 401. In *Gantenbein v. Bowles*, 103 Or. 277, 289, 203 P. 614, this court quoted with approval from *Corey v. Wadsworth*, 99 Ala. 68, 11

So. 350, 353, 42 Am. St. Rep. 29, 23 L. R. A. 618, as follows:

> " 'Going business or establishment' is a term properly applied to a corporation which 'is still prosecuting its business with the prospect and expectation of continuing to do so, even though its assets are insufficient to pay its debts.' "

To the same effect, see *Garetson Lumber Co. v. Hinson*, 69 Or. 605, 609, 140 P. 633; *Sabin v. Columbia Fuel Co.*, 25 Or. 15, 27, 34 P. 692, 42 Am. St. Rep. 756.

The use of the words "public market utility" in connection with the word "going" does not alter the case. It is argued that because a public utility may charge rates sufficient to enable it to render a public service and has the right to earn a return sufficient to induce investment the term "public utility" of itself imports that profits are being earned. If this were so, then many public utility corporations in this country, which have continued over periods of time to render the service for which they were organized while suffering a loss, would have ceased to be public utilities. It is hardly necessary to state that this is not true.

The City argues the question as though the Market Company was to operate the market experimentally for a period of time to determine whether the venture would be a profitable one, but no such meaning can be gotten out of the contract, since it was agreed that the Market Company should convey the property "upon the completion of said public market building and the purchase and installation therein of the equipment, materials, and supplies described in said Exhibit 'B' ". No time, therefore, was allowed or permitted for such period of experimentation. The evidence shows, indeed, that Commissioner Clyde, on October 19, 1931, or a

little over a week before the contract was executed, suggested in writing to the Council that there should be such an experimental period to enable the "water front promoters" to "demonstrate the earnings to the City's satisfaction before the City takes over the property as its own"; but nothing came of the suggestion, and the contract was executed without such a provision.

Moreover, it is unreasonable to suppose that the Market Company, under the conditions imposed by the contract, would have agreed to turn over to the City a market earning profits, since the City kept within its control all the factors which would determine whether or not a profit could be made. The City reserved the right to dictate the amount of invested capital in the enterprise, and the selection of tenants and the terms and conditions of all leases were subject to its approval; and the City could control the amount of space to be leased, since by Paragraph 8 of the contract it was authorized to reserve space "for municipal operation of any concession or privilege". No limitation was placed upon this right.

The phrase in question is a part of the sentence in which the Market Company agreed to perform leasing service for the procuring of tenants, and, in our opinion, was intended to mean nothing more than that, at the time the City took over the building, it should have a substantial number of tenants and be open for business and in operation as a market, and in that sense that the market should be a going concern or a going public market utility.

The correctness of this interpretation is conclusively established by the evidence of the negotiations between City Attorney Grant and Mr. Farrens. In the

first draft of contract prepared by Mr. Grant, to which we have already made extensive reference, Paragraph 9 contained the words, "a going *revenue producing* public market utility". In his letter of October 21, 1931, from which we have previously quoted, Mr. Farrens objected to the use of the words we have italicized for the following reasons as stated by him:

"I believe it will also be desirable to eliminate the words 'revenue producing', as those words appear in the fourth line on page 14 of the preliminary draft. I make this suggestion not because of any reluctance on the part of Public Market Company of Portland to agree to deliver a going concern but because of what I conceive to be the uncertainty injected into the sentence by the use of those two words. In other words, I fear that it might be contended that unless the market is being operated at a net profit at the time it is proffered to the City the City would be under no obligation to accept it and there would be considerable room for dispute as to whether or not operations were actually resulting in a net profit. Furthermore, it would not be at all surprising if the first month or two of operations fails to produce a net profit, as it is very seldom that an institution of that size can get under way to an extent permitting the realization of a net profit during the first month or two of operations. I know that it was not the intention of the agreement to require that the institution be on a net revenue producing basis at the time of a transfer, but I fear that such an interpretation might later be attempted to be placed upon the language. We do expect to deliver to you a going public market utility with a large percentage of occupation and a considerable gross revenue. This, I believe is what the City expects to receive and all that is intended to be required by Section 9 of the preliminary draft of the agreement."

Mr. Grant acceded to Mr. Farrens' suggestion, struck the words "revenue producing" out of his draft, and omitted them from the final draft which was executed by the parties.

It is thus manifest that the parties agreed upon a meaning of the language in question contrary to that now insisted upon by the City. Whether we look to judicial definition, the context in which the words were used, or the understanding of their import as disclosed by the correspondence between the attorneys, the City's contention must be rejected.

2. *Performance by the Market Company.*

Delays in the commencement of construction, due to litigation and other causes, were waived by the City. By December 15, 1933, the building, though not completed, was occupied up to 90 per cent of its capacity by tenants secured by the plaintiff, and on that date the market was opened and commenced to do business. The building was completed in the latter part of April, 1934, and there is no suggestion in the evidence nor any contention that it was not constructed and equipped in full and exact compliance with the plans and specifications of the contract and the changes demanded by the City while construction was going forward. On May 25, 1934, the Security Savings & Trust Company, at that time trustee under the mortgage of the market property securing bonds held and owned by the RFC, made a tender of the premises on behalf of the Market Company. This was rejected on the ground that Security Savings & Trust Company and the RFC were strangers to the record. Further delay ensued, and finally, on November 9, 1934, the Market Company itself made a formal tender, offering, upon payment of the purchase

price, to deliver a warranty deed, bill of sale, contracts, insurance policies, and possession of the premises. During all this time operation of the market had continued.

On November 14, 1934, the Council met and passed a motion repudiating the contract. No reason whatever was assigned for this action. The motion reads as follows:

"Respecting the matters and documents coming under Council Calendar Nos. 5775, 5776, 5777, and 5778, I move that the Auditor be directed to inform the Public Market Company of Portland and the First National Bank of Portland that the tender made to the City of Portland by and through said Calendar numbers is rejected; that the Auditor be further instructed to inform the Public Market Company of Portland and the First National Bank of Portland that the City of Portland recognizes no duty upon its part to comply with any terms of any alleged agreement between it and the Public Market Company and particularly with reference to that document dated October 28, 1931, referred to in said Calendar numbers hereinabove mentioned, and that the City of Portland does not recognize any liability or obligation on its part to purchase, lease, acquire, or possess the real property and improvements listed, mentioned, and described in the Calendar numbers hereinabove mentioned, and that all said calendars containing said matters and documents be filed and given no further consideration."

From this brief recital it is evident that the Market Company produced and tendered to the City a "going public utility market" within the meaning of those words properly construed and as understood by the parties when they incorporated them in their agree-

ment. It is not alleged that there was a failure of performance in any other respect. It is true that the City charges that in several particulars the conduct of the plaintiff was not exemplary, but these matters are urged as reasons why the plaintiff is not entitled to specific performance of the contract. Even though proven, they would not constitute failure of performance, except as they depend upon the City's erroneous construction of the phrase ''a going public market utility''.

There is a hint of fraud in the City's answer, reiterated on the argument, and which we shall notice. It is alleged that the plaintiff represented to the City that the plaintiff's officers ''had gathered special knowledge and information concerning public markets and that the public market proposed by them could and would be made a going public utility of such successful nature as to create a ready sale for utility certificates'', that these representations were false and were relied on by the City. The representations in question are contained in the Market Company's proposal of February 3, 1931. The predictions therein may have been overly optimistic, but there is no evidence whatever that they were intentionally false or recklessly made. That the City did not enter into the contract in reliance on these representations, but with full knowledge of the hazards of the undertaking, is demonstrated by the report, under date of October 2, 1931, of the special market committee, composed of two commissioners, the city attorney, the city engineer, and two other officials. The committee was considering three proposals (one being that of the plaintiff), and one of the questions before it related to the method of compensating whatever company might be awarded

the contract for service to be rendered in securing tenants. On this subject the committee said:

> "The members of your committee are of the opinion that it is impractical at this time to make a lump sum award in the contract for negotiations and the closing for leases in the building that is finally selected *on account of uncertainty of prices, uncertainty of desirable tenants, and the uncertainty as to the percentage of occupancy that would be obtained.*" (Italics supplied.)

The committee therefore recommended an agreement for payment from the income of the market of 10 per cent of the first year's gross rental for which leases were contracted.

■ In our opinion, this evidence, without more, effectually disposes of the City's claim that it was taken in by the roseate prospectus of a clever promoter.

The truth is, as disclosed by the record, that the representatives of the City not only made a thorough study of the proposals of the plaintiff as well as of others desirous of entering into a contract to build the market, but they obviously had as good and reliable sources of information and means of getting at the facts as could have been available to anyone.

No one can say now, on this record, with any assurance that the market would not have prospered had the City carried out its engagement in good faith. The representations made by the Market Company related to a market to be owned and operated by the City. It would have been practically a monopoly. Had the City's enthusiasm for a municipally owned market continued unabated, had it made a good faith effort to sell the public utility certificates, had it accepted the property and operated the market, for all that anyone can now

determine there might have been a different story. The Market Company has been compelled to contend with conditions that were never contemplated and for which it is not responsible. Competition has come from another public market a few blocks distant; while, as the record discloses, the City's attitude and the uncertainty in the minds of tenants and prospective tenants as to whether the City would take over the market injured the business in its very beginning. The unfortunate experience of the Market Company is not to be taken as a criterion of what the City might have accomplished. Municipal ownership and operation have never been tried; had they been, the faith of the promoters of the enterprise would, perhaps, have been vindicated. We think that the charge, or intimation of fraudulent conduct on the part of the Market Company is baseless and without foundation.

The Market Company, in our opinion, fully performed its undertaking and the City's repudiation of the contract was wrongful and without justification. The question of the remedy to which the plaintiff is entitled must, therefore, next be considered.

### 3. *The Remedy.*

The remedy of specific performance, by ordering the City to sell public utility certificates, is not now available. The City's repudiation of the contract, this protracted litigation, and other circumstances not necessary to be mentioned, make it highly improbable that a purchaser could be found for the certificates. To decree the sale of securities for the purpose of financing a public utility market enterprise, which now apparently has become abhorrent to the City, would be, in our opinion, little more than an idle gesture.

■ It is a well recognized rule of the law of contracts, generally, that "where the promise is to pay out of a fund to be realized in a certain way, there is an implied obligation to use reasonable diligence in performing the act upon which payment is contingent. In default of such diligence payment becomes due without performance of the condition." 12 Am. Jur., Contracts, 886, § 329; 17 C. J. S., Contracts, 939, § 456d.

■ The foregoing rule is a particular application of a larger principle thus stated in 3 Williston on Contracts (Rev. Ed.) 1952, § 677:

> "It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure."

See, *Winklebleck v. City of Portland*, 147 Or. 226, 242, 31 P. (2d) 637; 12 Am. Jur., Contracts, 885, § 329; Restatement, Contracts, 468, § 315; *Dill v. Pope*, 29 Kan. 289; *Denny v. Campbell's Ex'r.*, 9 Ky. L. Rep. 367, 4 S. W. 301; *Scranton Axle and Spring Company v. Scranton Board of Trade*, 297 Pa. 26, 32, 146 Atl. 139; *Noland v. Bull*, 24 Or. 479, 33 P. 983; *White v. Snell*, 5 Pick. 425, 9 Pick. 16; *Phoenix Oil Co. v. Mackenzie Oil Company*, 34 Del. 460, 154 Atl. 894; *Leonard v. Prater*, (Tex. Civ. App.) 18 S. W. (2d) 681; *Earle v. Sunnyside Land Co.*, 150 Cal. 214, 223, 88 P. 920; *Williston v. Perkins*, 51 Cal. 554; *Gliddon v. McKinstry*, 25 Ala. 246; *Crooker v. Holmes*, 65 Me. 195, 20 Am. Rep. 687; *Rumsey v. Livers*, 112 Md. 546, 552, 77 Atl. 295; *Linn v. Butler*, 8 Colo. 355, 8 P. 588; *Cape Fear & Deep River Navigation Co. v. Wilcox*, 52 N. Car. 481, 78 Am. Dec. 260; *Brackett v. Knowlton*, 109 Me. 43, 82 Atl. 436; *Jones v. Walker*, 13 B. Mon. (Ky.) 163, 56 Am. Dec. 557. And,

see, *Barber Asphalt Paving Co. v. City of Denver*, 72 Fed. 336. Cf. *Arment v. Yamhill County*, supra.

The failure and refusal of the City to endeavor to create the fund with which to pay the purchase price by the sale of public market utility certificates was, therefore, a violation of one of the terms implicit in the contract, and the liability of the City thereupon became fixed. What is the nature and extent of that liability? If this were a controversy between private individuals, unhampered by restrictions on their power to contract, it may be that a decree of specific performance would be warranted; but, in our opinion, that remedy cannot be granted here without ignoring the charter limitation on the Council's power to incur liabilities.

The controlling principle here is the same as that which lies at the root of the local improvement cases in this state, which hold that a city will not be permitted to escape liability on a contract for work performed, by neglecting to levy an assessment in order to create the fund to which the contractor has agreed to look for payment of the contract price. See *J. H. Tillman Co. v. City of Seaside*, 145 Or. 239, 25 P. (2d) 917; *Dennis v. City of McMinnville*, 128 Or. 101, 269 P. 221; *O'Neil v. City of Portland*, 59 Or. 84, 113 P. 655, and cases there cited.

In this class of cases recovery of the contract price as damages in an action *ex delicto* is sustained on the theory that "when the municipality passes an ordinance for a local improvement, it is its duty to prosecute with diligence the means afforded to it under its charter to realize the fund to pay for such improvement out of the property benefited", and a failure to perform that duty is a tort for which the city must respond. *Commercial National Bank v. City of Portland*, 24 Or.

188, 197, 33 P. 532, 41 Am. St. Rep. 854. See, also, *J. H. Tillman Co. v. City of Seaside,* supra; *Dennis v. City of McMinnville,* supra; *Little v. City of Portland,* 26 Or. 235, 57 P. 911.

■ The local improvement cases have been cited and relied on by the Market Company. Counsel for the City, on the argument and at one point in their brief, conceded their applicability, though at another point in their brief they take a contrary position, because, it is said, the rule of these cases applies only when a municipality is negligent, and there is no evidence of negligence here. But, if the City was not guilty of negligence, it was guilty of something worse—an outright and unwarranted refusal to be bound by its lawful undertaking. Under the broad principle of which the local improvement cases furnish an illustration, negligence is not the touchstone, but the failure, whether intentional or otherwise, to use the diligence which "the contract itself imports". *White v. Snell,* supra; 12 Am. Jur., Contracts, 886, § 329; 17 C. J. S., Contracts, 939, § 456d. "If a party puts it out of his power to perform his contract, his liability at once accrues. It matters not whether by his neglect this be so, or whether it be intentional", *Crooker v. Holmes,* 65 Me. 195, 199, 20 Ann. Rep. 687; *Rumsey v. Livers,* 112 Md. 546, 554, 77 A. 295. To the same effect, see, *Oklahoma City v. Orthwein,* 258 Fed. 190, 195. The doctrine is, in truth, founded in common honesty and in the law's purpose to prevent evasion of the obligations of a contract. It governs the conduct of municipalities no less than others. See *J. H. Tillman Co. v. City of Seaside,* supra.

■ But the measure of damages is not the same in this case as in the local improvement cases. In those cases the municipality has received the full benefit of

the contractor's services and the contractor is out the full amount of the contract price. That, therefore, is the measure of his damages. Here the plaintiff has the land, building and equipment, and its damages are diminished by the value of the property. The Market Company, therefore, is entitled to recover the difference, if any, between the contract price and the reasonable market value of the land, building and equipment at the time of the breach. 3 Sedgwick on Damages (9th Ed.) 2139, § 1023. If the evidence should establish that the building had no market value, then the plaintiff would be entitled to recover damages based on its reasonable value.

■ The plaintiff urges that the market building, constructed as it was for a special purpose, is somewhat like a unique chattel, and that, in analogy to the provisions of § 71-163 (3), 5 O. C. L. A. (which applies only to the sale of goods), the judgment should be for the full contract price, leaving the title to the property to pass through the final decree. This would be, in effect, specific performance of a general obligation contract, and would give the contract validity as such; whereas, for reasons already stated, the contract, if so construed, would be *ultra vires.* Whether the recovery granted were called damages or something else, the result would be essentially the enforcement *ex contractu* of an invalid contract.

■ No such consequence, however, attaches to the recovery of damages *ex delicto,* under the theory of the local improvement cases, for there "the right of recovery is not upon the contract, which has been fully performed, but upon facts and circumstances independent of the contract," and "the liability thus imposed is not within the constitutional and statutory

limitations in regard to the creation of indebtedness.'' *Little v. City of Portland,* supra.

Based on some evidence in the record, the City has urged that in no circumstances is the plaintiff entitled to relief because it would not have been possible to sell an issue of public market utility certificates at the time that the City should have performed its contract. It did not put its repudiation of the contract on that ground, and the proper way in which to have determined that question was by a good faith effort to make the sale. *Denny v. Campbell's Ex'or,* supra.

4. *The Reconstruction Finance Corporation and the Bank.*

In order for plaintiff to obtain the money necessary for the performance of the contract, it borrowed from the RFC the sum of $775,000, and issued and delivered to the RFC bonds agregating said sum, to secure the payment of which it executed and delivered to the Security Savings & Trust Company, the predecessor in interest of the First National Bank of Portland, as trustee, a deed of trust mortgaging to said trustee the real premises described in the contract, together with all improvements to be made thereon and all materials, supplies and equipment to be placed therein. No payments have been made on said bonds with the exception of $500, and there is now due and owing to the RFC the sum of $774,500 with interest thereon at the rate of six per cent per annum, payable semi-annually, as provided in said bonds.

To induce the RFC to make this loan the City, on April 13, 1933, adopted a resolution subordinating all its rights in the contract to the rights of the Security Savings & Trust Company under the mortgage secur-

ing such bonds and to the rights of the holders of the bonds.

The RFC and the bank, having refused to join as plaintiffs in the suit, were made parties defendants and filed identical answers, setting up their rights and praying, among other things, for specific performance of the contract and payment to the bank, as trustee, of the amount of the bonds, principal and interest, out of the moneys found due from the City.

■■■■ The RFC and the bank contend that, even though the contract be construed as one imposing upon the City only the obligation to pay the purchase price out of a special fund, nevertheless the City, by the adoption of the resolution referred to, and a later resolution of similar import, is estopped from asserting against them the true meaning and intent of the contract. Since, however, the contract, if construed as a general obligation contract, would be *ultra vires* and void, this contention is sufficiently answered by reference to the principle that one dealing with a municipal corporation is charged with notice of every limitation upon its powers contained in its charter. A municipal corporation is not estopped by the acts of its officers when they exceed their powers. The rule is that persons dealing with such officers must, at their peril, ascertain the scope of their authority. *Tuttle v. Beem,* 144 Or. 145, 157, 24 P. (2d) 12.

■■ But, quite apart from this consideration, there is no basis in the evidence for the claim of estoppel. The resolutions adopted by the City—which are too lengthy to be set out—did no more than represent to the RFC that the contract, all the terms and conditions of which were referred to in the resolutions, was then subsisting. There was no misrepresentation by the City, and hence

no estoppel. It did not construe the contract in the resolutions adopted. It merely recited some of its terms and referred to all of them. The RFC accepted as collateral security the assignment of an ambiguous contract, and in doing so was charged with knowledge that the instrument was subject to interpretation aided by parol evidence. The RFC can hardly claim to occupy the position of a *bona fide* purchaser for value of a negotiable instrument subject to hidden equities.

Besides, there is uncontradicted evidence that copies of all the pleadings and briefs in the Whitbeck case were forwarded by mail to the RFC, as they were filed, by the attorney representing Whitbeck. This was done during the time that the Market Company was negotiating with officials of the RFC for a loan. It is a fair presumption that these documents were not thrown in the waste basket, but reached the hands of responsible officials in charge of this particular matter, whose knowledge would be that of the corporation. The pleadings and briefs in the Whitbeck case, as previously stated, show that the City and the Market Company interpreted the contract as a special fund contract. In view of this evidence, the RFC ought not to be heard to say that in making the loan to the Market Company it relied on a general obligation of the City.

It would have been not unusual for the RFC to make a loan of this character, with no other security than the project itself. The Emergency Relief and Construction Act of 1932 granted to it power to make loans only to aid in financing projects, such as a municipal market, "which are self-liquidating in character," 1 U. S. Code (1940 Ed.) § 605b (3) p. 1195. By paragraph number (6) of that section the project "shall be deemed to be self-liquidating if such project will be made self-

supporting and financially solvent and if the construction cost thereof will be returned within a reasonable period by means of tolls, fees, rents, or other charges, or by such other means (other than by taxation) as may be prescribed by the statutes which provide for the project * * *'' Although the statute does not preclude the corporation from taking the additional security of a general municipal obligation, if the project is otherwise eligible as a self-liquidating one, (see Circular No. 3 of the RFC, Information for Prospective Applicants for Loans for ''Self-Liquidating'' Projects under the Emergency Relief and Construction Act of 1932, February, 1933) still it is obvious that the purpose of the act was to relieve unemployment by financing self-liquidating projects during a period of depression when, as we judicially know, municipal corporations and other public bodies were hard put to find tax moneys sufficient to meet even the ordinary expenses of government. The RFC knew that the Portland public market was to be a self-liquidating project, and on that basis, as we think, made the loan to the Market Company.

5. *Conclusion.*

As indicated, the cause must be remanded to the circuit court for the purpose of assessing damages. In our former opinion we held that the jurisdiction of equity was properly invoked to compel specific performance of the City's agreement to create the fund by issuing and selling public utility certificates (160 Or. 166). That remedy, as we have determined, is no longer available, but, within the principle that equity will, in certain circumstances, retain jurisdiction to give complete relief and assess damages, even though the basis of equitable jurisdiction has been taken away,

we think that there should be no change in the forum. The case falls within the reasoning of our decision in *Fisk v. Leith*, 137 Or. 459, 463, 299 P. 1013, 3 P. (2d) 535. See, also, *Prouty Lbr. & Box Co. v. McGuirk*, 156 Or. 418, 428, 66 P. (2d) 481, 68 P. (2d) 473; *American Surety Co. of New York v. Hattrem*, 138 Or. 358, 364, 3 P. (2d) 1109, 6 P. (2d) 1087; *Dunn v. Henderson*, 122 Or. 331, 336, 258 P. 183; *Oregon Growers' Co-Operative Association v. Riddle*, 116 Or. 562, 569, 241 P. 1011. Another reason why the equity jurisdiction should be retained is the necessity of a complicated accounting in order to determine under various provisions of the contract the total purchase price, with no authority in a law court, according to the generally recognized practice in this state, to appoint an auditor or referee to take the account. 1 Am. Jur., Accounts and Accounting, 301, § 53.

The bank, as trustee under the indenture of mortgage, holds an assignment of all the rights of the Market Company under the contract, as partial security for payment of the mortgage indebtedness, which now appears to be in default. Any judgment for damages which may be rendered should, therefore, inure to the benefit of the bank and RFC up to the amount of such indebtedness, and these parties are entitled equally with the Market Company to assert and prosecute the claim for damages in this suit.

Such amendments of the pleadings as may be proper under the views here expressed should be permitted by the circuit court. The appellants will recover their costs and disbursements on this appeal.

The decree of the circuit court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

RAND, J. (dissenting). The majority opinion holds that the plaintiff completely performed the contract and that the city of Portland has repudiated the contract in toto. With both of these conclusions I concur. Those facts being conceded, I cannot concur in holding that the plaintiff is not entitled to have the contract specifically enforced. For in no other way than by the payment of the sums stipulated in the contract can the plaintiff receive the full benefit of its contract.

The evidence shows that this written contract was entered into after negotiations had been pending between the city and the plaintiff for a long time. While so pending and until shortly before the contract was made, both parties contemplated that the city should raise the moneys it was to become obligated to pay by the issuance and sale of public market utility certificates to be secured by a mortgage on the property after the city had acquired title thereto. Had this intention been adhered to, it is only reasonable to suppose that the contract would have so provided. On the contrary, the contract expressly provides that:

"Upon the completion by the Company of its obligations under this agreement, and at the time of the tender by the Company to the City of proper conveyances of said property and assignments of its leases, contracts and insurance policies affecting said premises, the City shall accept said conveyances and said assignments and shall pay to the Company the sum of $1,244,790.66; and as of the date of said conveyances and assignments and of the making of said payment by the City to the Company, there shall be an accounting between the City and the Company, and the Company shall pay to the City all prepayments of rent and pro rata shares of premiums and deposits based upon the unexpired portion of existing leases and all repayments of other moneys under existing contracts which shall

represent unearned income of the Company, and the City shall pay to the Company all prepaid expenses which the Company has at that time advanced under the terms of its existing contracts. In addition to the principal sum of $1,244,790.66 hereinabove mentioned, and at the time provided for the payment of said sum, the City shall also reimburse the Company in the full amount of the cash advanced and/or liability incurred by the Company in the purchase of the equipment, materials and supplies described in Exhibit 'B', and shall pay to the Company, in addition thereto, ten per cent (10%) of the purchase price of said equipment, materials and supplies to cover the services of the Company in making said purchases. Such purchases of materials, equipment and supplies shall be subject to the approval of the Council in all respects, including the price paid therefor. All payments due from the City to the Company hereunder, if unpaid to the Company when due, shall thereafter bear interest at the rate of six per cent (6%) per annum, payable quarterannually."

This constituted a definite and specific promise by the city that, when the plaintiff had completely performed its contract, the city would pay the sums stipulated in the contract, without any reference whatever to the manner by which the city should raise the money. To now construe this contract as if it contained a provision that the stipulated sums should be obtained by the issuance and sale of public market utility certificates is to add new terms to the contract and violates the provisions of section 2-216, O. C. L. A., which provides:

"In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is, in terms, or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are

several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all.''

The evidence shows, and I think conclusively, that, because of legal difficulties which rendered it impossible for the city to carry out its original plan of issuing and selling public market utility certificates, this plan was abandoned shortly before the contract was entered into, and that the city then decided to raise the money in a different manner from that first contemplated. In no other manner can the express promise of the city contained in the contract be explained.

Nor can I concur in holding that, in order to render this contract valid, it is necessary to construe this contract as if it contained a specific provision that the moneys should be obtained by the issuance and sale of public market utility certificates. Either this contract is valid and enforceable or it is invalid and void for all purposes. It is not logical to say that, so far as the granting of specific performance is concerned, the contract is invalid but, for the purposes of rendering the city liable to an action for damages for its breach, it is valid. If it is invalid for one purpose, it is necessarily invalid for all purposes. There is no analogy whatever between this contract and a contract entered into by a city for the improvement of a public street which improvement is to be paid for by assessments to be levied by the city upon the property affected by the improvement. In that case, the city becomes liable only for failure to levy the assessments and this failure, it is held, results from the negligence of the city officers in failing to make the levy. This, of course, like all other negligent actions is a tort. Here there was no tort. The breach of the contract by the city was not the result of any negligence

upon the part of its officers but was a wilful and intentional act upon their part. Consequently, if this contract is void because entered into by the city in violation of some charter provision, it is void for all purposes and no action will lie against the city for a breach thereof.

It is elementary that a city, like all other municipalities, in the exercise of its corporate powers may enter into any contract or do any act not expressly or by necessary implication forbidden by the constitution or statute of the state, or by some provision of its charter. Neither the constitution nor the statute of this state prohibited the city from entering into this contract, while, by section 151 of the city charter, the city was expressly authorized to enter into the contract. That section provides:

> "The City of Portland shall have the power to construct, condemn, purchase, add to, acquire, maintain, operate and own all or any part of any public utility or any plant or enterprise, for the purpose of serving the city and the people thereof for uses public and private. Such power may be exercised in any lawful manner and shall include the power to purchase, condemn or otherwise acquire any franchise heretofore granted to operate a public utility."

The only limitation upon the exercise of the power thus conferred is that contained in section 160 of the charter, which, so far as material here, provides:

> "No indebtedness shall be incurred for the acquisition of any public utility under the provisions of this Charter which, together with the existing bonded indebtedness of the city, shall exceed at any one time seven per centum of the assessed value of all real and personal property in the city, etc."

It is not even contended that the making of this contract violated section 160, by incurring an indebtedness

in excess of said limitation. Hence, it is wholly imma-terial, so far as the validity of this contract is con-cerned, whether the indebtedness thereby incurred was a general obligation of the city or was one payable out of a special, self-liquidating fund.

It is contended, however, that this contract is void because it incurs liability in violation of section 193 of the charter which, among other things, provides:

"No money shall be expended or payment made from any fund of the City, except assessment funds until a specific appropriation shall be made there-for * * *

"Any liability or liabilities incurred by the Council to be paid in any fiscal year, which singly or in the aggregate shall be in excess of the revenues for such year shall be null and void. * * *

"The City shall issue no warrants or other evi-dences of indebtedness, except upon special assess-ment funds, and the payment of judgments against the City, unless there is money in the treasury duly appropriated and applicable to the payment of the same on presentation, and all evidences of indebted-ness issued contrary to this provision shall be null and void. Any member of the Council voting to in-cur any liability or to create any debt in excess of the amount limited and authorized by law, shall be deemed guilty of malfeasance in office, and for such malfeasance such member may be removed from office."

The fiscal year of the city, as defined by section 189 of the charter, commences on the first day of December and ends on the last day of November of the succeeding year. Under this contract, which was entered into dur-ing the fiscal year ending on the last day of November 1931, no moneys did or could become payable until July 15, 1932, which was the fiscal year next succeeding the

making of the contract. That section applies only to liabilities incurred and payable during one and the same fiscal year and, hence, this contract was not void upon that ground.

No provision for the expenditure of the moneys falling due under the contract was itemized or included in the city budget, either for the year 1932 or for any succeeding year. Under section 187 of the charter, it is made the duty of the council, on or before the third Monday of November of each year, to make a complete budget of the revenues and expenditures for the ensuing fiscal year. This provision of the charter is mandatory and imposes a duty which the council is bound to fulfill. Should the council fail to perform that duty and make no provision in the city budget for the payment of any valid obligation of the city falling due in any fiscal year, such failure upon the part of the council would not affect the validity of the city's obligation to make such payment, for it is elementary that the binding effect of a valid contract cannot be destroyed or the obligation thereof impaired by any act, declaration or failure to act by one party to a contract unless assented to by the other. Moreover, under section 193 of the charter, where the council fails to itemize in the city budget a sufficient sum of money with which to pay a valid claim against the city, the person to whom the same is payable is entitled, upon obtaining a judgment against the city, to have a warrant issued by the city for the amount of his judgment, and the city has authority to issue such warrant. Hence, it is wholly immaterial, so far as plaintiff's rights under the contract are concerned, whether the sums payable under the contract were or were not included in the city budget for any of said years.

If, under the provisions of section 193, it could be maintained that all contracts entered into by the city which were not to be performed or become payable until the next fiscal year were illegal, then the city could enter into no contract for the payment of money unless it was payable during the fiscal year when made and then only if a specific appropriation for its payment had been made. Obviously, such was not the intention of the charter and, if given that construction, would seriously hamper the city in the exercise of its corporate powers. Decisions from other states construing dissimilar provisions limiting the powers of municipalities ought not to be followed in construing the provisions of section 193, unless the language or meaning of such provisions are identical with those involved here.

From the language employed in section 193 of the charter, it seems obvious that the limitation thus imposed was intended to apply only where the making of the contract and the time of payment under the contract were both to occur during one and the same fiscal year and has no application to this contract. If this is wrong, then the contract is unenforceable and void unless the city is estopped to make the defense. That the city is estopped to deny the validity of this contract, I think is clearly established by the evidence.

In order for plaintiff to obtain the money necessary for the performance of the contract, it borrowed from the Reconstruction Finance Corporation the sum of $775,000, and, to secure the payment thereof, issued and delivered to the Reconstruction Finance Corporation bonds aggregating said sum and, to secure the payment of said bonds, executed and delivered to the Security Savings and Trust Company, the predecessor in interest of the First National Bank of Portland, as trustee,

a deed of trust mortgaging to said trustee the real premises described in the contract, together with all improvements to be made thereon and all materials, supplies and equipment to be placed therein. No payments have been made on said bonds with the exception of $500, and there is now due and owing to the Reconstruction Finance Corporation the principal sum of $774,500 with interest thereon at the rate of six per cent per annum, payable semi-annually, as provided in said bonds.

To induce the Reconstruction Finance Corporation to loan said moneys to the plaintiff, the city council adopted two resolutions, the first on October 6, 1932, and the last on April 13, 1933, both of which, with the exception of a correction in the description of the real property mentioned in the contract between the plaintiff and the city, were substantially identical in terms. The resolution last adopted is Resolution No. 20649, which reads as follows:

"The Council finds that under and pursuant to authority given under the terms of Ordinance No. 61566, passed by the Council October 10, 1931, and under authority of Resolution No. 20291, adopted by the Council October 28, 1931, an agreement was entered into on the 28th day of October, 1931, by and between the Public Market Company of Portland, an Oregon corporation, and the City of Portland, a municipal corporation of Multnomah County, Oregon, wherein and whereby Public Market Company of Portland agreed to sell and the City of Portland agreed to buy certain real property therein described in paragraph (3) of the contract, together with the building and improvements thereon and all equipment, material and supplies therein, upon the terms and for the price set out in the contract, for more particular description of said property and terms and conditions of the contract particular reference being hereby made to Contract No. 3214,

filed in the office of the Auditor of the City of Portland, October 28, 1931, and the Council further finds that the Board of Directors of Reconstruction Finance Corporation have authorized the purchase of not exceeding $775,000 aggregate principal amount of the first mortgage, six per cent Series Gold Bonds of the Public Market Company of Portland, subject to certain conditions, among which is a condition that such bonds be issued and secured by a first mortgage upon the property described in the contract, dated October 28, 1931, above referred to, and a condition that the City of Portland subordinate all rights in such contract to the rights of the Trustee under the mortgage, securing such bonds, and to the rights of the holders of such bonds and consent to the assignment by Public Market Company of Portland of such contract to the trustee under such mortgage to be held by the Trustee as further security for the bonds, and also finds that on October 6, 1932, by Resolution No. 20557 a resolution was adopted by the Council subordinating the rights of the City under said contract to a mortgage to be made by the Reconstruction Finance Corporation, and at that time it was understood that said mortgage was to be taken in the name of Reconstruction Finance Corporation, and the resolution so read, and the Council finds that an error was made in setting out the description of the real property, in the contract between the Public Market Company of Portland and the City, in this: that the third word in the fifth line from the bottom of the description reads 'easterly' instead of 'westerly', NOW THEREFORE,

BE IT RESOLVED by the Council that to induce the Reconstruction Finance Corporation to make said above described loan to the Public Market Company of Portland, the City of Portland, through its Council, does hereby subordinate all rights in the contract dated October 28, 1931, being No. 3214 in the Auditor's office of the City of Portland, to

the rights of Security Savings and Trust Company as Trustee under the mortgage securing the bonds above referred to, and to the rights of the holders of such bonds in a sum not to exceed $775,000, and hereby consents to the assignment of said contract between the Public Market Company, of Portland and Security Savings and Trust Company, Trustee, as security for said bonds.

BE IT FURTHER RESOLVED by the Council that the third word in the fifth line from the bottom of the description in the said contract shall be changed from 'easterly' to 'westerly'.

Adopted by the Council April 13, 1933.''

Because of their refusal to join as plaintiffs in the suit, the Reconstruction Finance Corporation and the First National Bank of Portland were made defendants. They have each filed an answer in the nature of a cross-complaint, setting up the foregoing facts and alleging that, by reason thereof, the city is estopped to deny either the validity of the contract or its obligation to pay plaintiff the sums stipulated in the contract, and praying that the contract be specifically enforced according to its terms and that, if that remedy is denied, the city then be required to pay to the Reconstruction Finance Corporation the amount due and unpaid upon said bonds and, upon said payment being made, they offered to transfer and assign to the city said mortgage and bonds and to discharge and release all claims and demands upon their part as against the city or the property described in the contract.

At the close of the trial, the court entered a decree not only denying any relief to the plaintiff but also denying to each of the cross-complainants the relief prayed for in their cross-complaints, and further providing that plaintiff's suit and the cross-complaints be

dismissed with prejudice. Each of said cross-complainants as well as the plaintiff has appealed from said decree.

It is well settled that a municipal corporation, like a natural person, may be concluded by an estoppel *in pais,* and that resolutions of the council of a city, when they are authorized to adopt such resolutions, stating the existence or performance of conditions precedent, are conclusive upon the municipality and estop it to show the contrary. See *Amazeen v. New Castle,* 76 N. H. 250, 81 A. 1079; *Gilbert v. Manchester,* 55 N. H. 298; *Colorado Springs v. Colorado City,* 42 Colo. 75, 88, 94 P. 316; 2 McQuillin, Mun. Corp., 2 ed., sec. 534; 6 McQuillin, Mun. Corp., 2 ed., sec. 2471, and authorities there cited.

It will be seen from the recitals contained in the foregoing resolution that, to induce the Reconstruction Finance Corporation to make said loan, the council represented to the Reconstruction Finance Corporation that the contract entered into between the city and the plaintiff on October 28, 1931, "wherein and whereby Public Market Company of Portland agreed to sell and the City of Portland agreed to buy certain real property therein described in paragraph (3) of the contract, together with the building and improvements thereon and all equipment, material and supplies therein, upon the terms and for the price set out in the contract", was entered into under and pursuant to the authority conferred by an ordinance of the city and a resolution adopted by the council.

The resolution further recites that "the City of Portland subordinate all rights in such contract to the rights of the Trustee under the mortgage, securing

such bonds, and to the rights of the holders of such bonds and consent to the assignment by Public Market. Company of Portland of such contract to the Trustee under such mortgage to be held by the Trustee as further security for the bonds''. The representation thus expressly made that the city ''consent to the assignment * * * of such contract * * * *as further security for the bonds''* which were to be issued by the plaintiff and to be purchased by the Reconstruction Finance Corporation conclusively sets at rest the contention that the Reconstruction Finance Corporation, in making said loan, was relying only upon its mortgage and was not relying upon the liability of the city under the contract to pay the purchase price, for otherwise the resolution would not have stated that the assignment of the contract by the city was made *''as further security for the bonds''*. (Italics ours.)

These were representations which the council had authority to make in order to induce the making of said loan and, upon these representations, the Reconstruction Finance Corporation, in making said loan, had a right to rely and, as shown by the evidence, it did rely. It seems clear, therefore, that the city is and of right should be estopped to deny the truth of these representations or to assert, as against the Reconstruction Finance Corporation, that the contract is not a valid and subsisting obligation of the city to the extent at least of paying the Reconstruction Finance Corporation the amount due under its loan.

That the city received and accepted the benefits resulting from the making of this loan appears from a letter written by a subsequent mayor, which is an exhibit in the case. That letter reads as follows:

CITY OF PORTLAND
OREGON
"MAYOR'S OFFICE JOSEPH K. CARSON, Jr.
MAYOR

April 7, 1934

Reconstruction Finance Corporation,
Washington, D. C.

Gentlemen:

I wish to express the appreciation of myself and others of this community for the material aid given by your organization in making possible the wonderful new market just completed by the Public Market Company of Portland.

The funds provided by your agency have been of tremendous benefit to this community through employment of labor and purchase of materials, and in bringing to fruition a project conceived eleven years ago.

This splendid edifice marks the first step in the rehabilitation of the seawall and Front Avenue area, which we sincerely hope may go forward with your guidance and financial assistance.

Yours very truly,
Joseph K. Carson, Jr.
Mayor."

It is also a familiar rule of law that a party cannot accept the benefits of a contract and, when called upon to perform his duties under it, repudiate the contract and assert that it is invalid unless the contract is actually in violation of law or wholly void. Also, it seems clear that the contract not being wholly void or in violation of law and having been fully performed by the plaintiff, and the city having received the benefits stated in the letter, it likewise should now be estopped to deny the validity of the contract as a justification for its own failure to perform.

"This estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and act on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts."

31 C. J. S., p. 237.

Equitable estoppel or estoppel *in pais* is defined in 19 Am. Jur., p. 634, as follows:

"* * * Equitable estoppel or estoppel in pais is the principal by which a party who knows or should know the truth is absolutely precluded, both at law and in equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion were allowed."

See also *Mitchell v. Hughes*, 80 Or. 574, 157 P. 965; *Security S. & T. Co. v. Portland F. M. Co.*, 124 Or. 276, 261 P. 432, and authorities there cited.

From these authorities, it seems necessarily to follow that the city is estopped to assert that the failure of the council to make a complete budget of the revenues and expenditures for the fiscal year beginning on December 1, 1931, and for subsequent years, as, by the charter, the council was required to do on or before the third Monday of November of each of said years, renders this contract invalid. It also seems clear that,

since such failure upon its part was known to the council on April 13, 1933, when the last of said resolutions was adopted for the purpose of inducing the Reconstruction Finance Corporation to make said loan, the city should be estopped to assert or claim that, because of this failure, this contract was not payable as a direct obligation of the city and in the manner and at the time stated in the contract.

During the trial and over plaintiff's objection, the city was permitted to introduce the oral testimony of several of the former members of the city council, who testified that it was not their intention, when entering into this contract, to create a general obligation upon the part of the city but to create a special self-liquidating fund to be derived from the issuance and sale by the city of public market utility certificates secured by a mortgage on the property. This was in direct contradiction of the express terms of the contract and, for that reason, was inadmissible.

"When parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing; and all oral testimony of a previous colloquium between the parties, or of conversation or declarations at the time when it was completed, or afterwards, as it would tend in many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties, is rejected. In other words, as the rule is now more briefly expressed, 'parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument'."

1 Greenleaf on Evidence, 16 ed., sec. 275.

In 1 Williston on Contracts, rev. ed., section 94, Professor Williston says:

"* * * It follows that the test of the true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

"The sound view has been well expressed by L. Hand, J.: 'A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words or acts of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent'."

In 4 Page on Contracts, section 2021, the rule is stated as follows:

"* * * It is not the actual secret intention of the parties to the contract, which the court is to ascertain, but it is the intention which the law attaches to the words which they have used, when read in connection with the surrounding facts and circumstances."

The evidence also shows that, from April to October, 1931, negotiations leading up to the making of this contract were carried on between the city and plaintiff and that during said time many declarations and

conversations were made and had between them in respect to the making of this contract. There was much evidence offered by the city in proof of these declarations and conversations and much of this is set forth in the majority opinion to justify the conclusion there reached.

Section 2-214, O. C. L. A., provides:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except in the following cases:

(1) Where a mistake or imperfection of the writing is put in issue by the pleadings;

(2) Where the validity of the agreement is the fact in dispute. But this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in section 2-218, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

There was no mistake or imperfection of the contract put in issue by the pleadings, nor, as we will later show, was there any ambiguity in any of the language used in the contract. The ambiguity referred to in our former opinion *(Public Market Company v. Portland,* 160 Or. 155, 83 P. (2d) 440) arose from words used in the title and body of Ordinance No. 61566 and had no reference whatever to the specific promise of the city to pay the stipulated sum when due under the terms of the contract. Nor was it alleged by the city that it had been fraudulently induced to enter into the

contract or that there was any fraud in the execution of the contract or leading up to the making of the same.

Section 2-218 O. C. L. A. provides:

"For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

In *Christensen v. Pacific Coast Borax Co.*, 26 Or. 302, 305, 38 P. 127, it was held that, notwithstanding the language of the section last quoted, the language of the contract must determine to what the parties have bound themselves, notwithstanding the right of the court to take into consideration the situation of the parties, the object they must have had in view and the circumstances. This parol evidence now referred to had no reference whatever to the circumstances under which the contract was made, or to the purpose for which it was made, but was merely evidence of prior negotiations which, under well settled rules of law, were merged in the contract. It is, of course, a fundamental rule of law that the situation of the parties when the contract was made, its subject-matter and the purpose of its execution are material to determine the intention of the parties and the meaning of the terms they use. However, this evidence was not given for that purpose, nor was it explanatory of any of said matters. Hence, so far as this evidence tended to vary or contradict the terms of the contract, or add a new term to the contract, it was inadmissible under the rule that when a contract in writing is clear and explicit, without latent ambiguities, parol evidence is not admissible either to contradict, add to or detract from or vary its

terms. See *Edgar v. Golden*, 36 Or. 448, 48 P. 1118; *Hilgar v. Miller*, 42 Or. 552, 72 P. 319; *Sutherlin v. Bloomer*, 50 Or. 398, 406, 93 P. 135; and *Sund & Co. v. Flagg & Standifer Co.*, 86 Or. 289, 168 P. 300. Page states the rule applicable to this question in section 2147 (4 Page on Contracts), as follows:

> "Extrinsic evidence of prior or contemporaneous oral agreements between parties is inadmissible to vary the terms of the written contract which they have entered into, and this is true of prior written negotiations."

In *Sutherlin v. Bloomer*, supra, it was held that:
> " * * * where the statement in the written instrument as to the consideration is of a contractual nature, as where the consideration consists of a specific and direct promise by one of the parties to perform certain acts, it cannot be changed or modified by parol or extrinsic evidence."

The evidence shows that this contract was drawn by Mr. Frank Grant, the city attorney, and that it was read over and considered by the council before the mayor and the city auditor were directed by the council to execute it on behalf of the city. The language of the contract is clear and explicit and no one understanding the English language could be mistaken as to the meaning and legal effect of the terms used.

As said in 1 Story's Equity Jurisprudence, 14th ed., section 172:

> "A mistake by a party as to his antecedent existing legal right, as distinguished from a mistake as to the legal import of the act done, is one which should be and is recognized as a ground for equitable relief from the consequences of such mistake, where the mistake can be rectified without injury to others."

The defense now sought to be interposed by the city is not a mistake of the council as to the existing legal rights of the city but a mistake as to the legal import of the acts done. This would not entitle the city to equitable relief, even though it had been pleaded as a defense.

It is not reasonable to hold that, because one of the drafts of the contract which was drawn but not executed contained both an express promise to pay the purchase price and also a recital that the making of the promised payment constituted a direct obligation upon the part of the city and that, since the contract, as executed, did not contain the latter recital, it must be given a different construction from that which would have been given to it had it contained such recital. Certainly a specific written promise to pay a definite sum of money for a valuable consideration is not strengthened by a further recital that the promise made is a direct obligation of the promisor and such words, if inserted, would constitute a mere surplusage and add nothing to the promise as made. Yet this seems to be one of the main grounds for holding that this contract is to be given a different interpretation than would be given to it had that recital been inserted in the contract.

It is contended that the parol evidence above referred to was admissible because of a supposed ambiguity in the language of the contract. The contract is not ambiguous and this court has never held it to be ambiguous. In our former opinion, we referred to ambiguous language contained in the title to Ordinance No. 61566, passed by the council on October 10, 1931. That title reads as follows:

"An Ordinance selecting and designing certain real property for use as a public market and authorizing the purchase of said real property and a building to be constructed thereon and equipment to be installed in said building upon the terms and conditions required by Ordinance No. 61192, passed August 5, 1931, and upon such other terms and conditions as shall hereafter be determined by the Council, and authorizing preparation, approval and execution of a contract with the Public Market Company of Portland, and declaring an emergency."

In our former opinion, we said:

"* * * What did the council mean when it authorized the contract to be executed 'upon such other terms and conditions as shall hereafter be determined by the Council'?"

Following this, in the opinion, is a statement showing what construction the council itself placed upon said language, after which this court said:

"* * * The council having put that construction upon the authority conferred by the last ordinance and having acted upon it, we think, it is conclusive upon the question of what construction should be placed upon the ambiguous terms before referred to, for clearly it cannot be assumed that the council or the city attorney intended or believed that they were violating any of the terms of the ordinance under which they were acting when they entered into this contract."

This clearly has no reference whatever to any ambiguity in the contract or to any of the terms or conditions contained in it and only referred to the authority under which the council was acting when it entered into the contract.

This is a contract for the sale and purchase of land and this is true although the consideration to be paid

by the city was largely for the construction of a public market building. As said in *Hale v. Wilkinson,* 21 Gratt. (Va.) 75:

> "Land always has, in the eye of the law, a peculiar value, and a contract for the sale and purchase of it, if unobjectionable, will, therefore, be specifically executed. In no other way can parties receive the full benefit of their contract. And no court, having jurisdiction of the subject, and being properly applied to for such relief, can withhold it but by an act of arbitrary power."

In *Johnston v. Wadsworth,* 24 Or. 494, 34 P. 13, Mr. Chief Justice LORD, speaking for the court, said:

> "* * * While it is said that specific performance is not a matter of absolute right in a party, but of sound discretion in the court, yet the rule has come to be established, if a contract respecting real property is in writing and is certain, fair in all its parts, for an adequate consideration, and capable of being performed, it is as much a matter of course for courts of equity to decree specific performance of it as it is for a court of law to give damages for the breach: 2 Beach, Equity Jurisprudence, § 636; Tiedeman, Equity Jurisprudence, § 493."

Applying the principle thus stated to the facts of this case, this contract was in writing, is definite, certain and specific in its terms, is fair in all its parts, is for an adequate consideration, and is capable of being performed, and this court has no discretion to refuse to award to plaintiff the equitable relief of specific performance.

In *Larrabee v. Bjorkman,* 79 Or. 467, 155 P. 974, this court, speaking through Mr. Justice BURNETT, said:

> "Where land or any estate or interest in land is the subject matter of the agreement, the jurisdiction to enforce specific performance is undis-

puted, and does not depend upon the inadequacy of the legal remedy in the particular case. It is as much a matter of course for courts of equity to decree a specific performance of a contract for the conveyance of real estate which is in its nature unobjectionable as it is for courts of law to give damages for its breach. Equity adopts this principle, not because the land is fertile, or rich in minerals, but because it is land, a favorite and favored subject in England and every country of Anglo-Saxon origin. Land is assumed to have a peculiar value, so as to give an equity for specific performance, without reference to its quality or quantity.''

To the same effect see *Slattery v. Gross*, 96 Or. 554, 187 P. 300, 190 P. 577; *Spencer v. Bales*, 108 Or. 339, 216 P. 746, and *Public Market Co. v. Portland*, supra, and cases there cited.

The contention that this court can, by the exercise of a proper discretion in this case and under the facts involved, refuse to grant plaintiff specific performance is, in my opinion, wholly unfounded. In treating of the discretionary power of a court of equity to grant or refuse to grant specific performance in a proper case, Professor Pomeroy says:

''* * * It is abundantly settled, at the outset, that the remedy is not 'discretionary' in the usual acceptation of the term; it is not given or withheld at the mere will and good pleasure of the judge; nor does it depend upon his own individual opinion, as to its propriety and feasibility; much less is it a matter of favor. * * * The decisions agree, with some variation in their language, but with none in the meaning, that the discretion is a judicial one, controlled and governed by the principles and rules of equity.''

Pomeroy's Specific Performance of Contracts, 3 ed., § 36, p. 114.

"* * * within the domain of equity jurisdiction remedies are not, in any true sense, discretionary, but are governed by the established principles and rules which constitute the body of equity jurisprudence."

Id., § 37, p. 116.

"* * * the contract must be certain, unambiguous, mutual, and upon a valuable consideration; it must be perfectly fair in all its parts; free from any misrepresentation or misapprehension, fraud or mistake, imposition or surprise; not an unconscionable or hard bargain; and its performance not oppressive upon the defendant; finally, it must be capable of specific execution through a decree of the court. An examination of these particulars will show, that, so far as they differ from the requisites to legal relief, they are merely a statement in part of the general principles which lie at the foundation of all equitable remedies."

Id., § 38, p. 117.

Again, Pomeroy says in section 46, p. 128:

"* * * The language which describes the remedy of specific performance as depending upon an exercise of discretion—even of judicial discretion—unless taken with certain limitations and interpreted in a particular manner, is misleading; it is a misconception which represents the granting of this relief as in any sense a matter of grace, or depending upon the favor of the court. Courts of equity do not sit, any more than courts of law, to distribute favors or acts of grace to their suitors; their judicial function consists in the protection of rights and the enforcement of duties by means of the remedies which they administer. The right to this particular remedy, being equitable, involves a variety of circumstances, incident, and relations which may promote, modify, impede, or prevent its use, and one of the most important of those cir-

cumstances consists in the fact that a denial of the relief does not, in general, leave a party without his legal remedy. Where all the proper conditions are present, the remedial right is as perfect, certain, and absolute as the nature of the remedy itself will permit.''

While I concur in holding that error was committed by the trial court and that the case must be reversed, I cannot concur in holding that the plaintiff is not entitled to have the contract specifically enforced, and therefore dissent.

Mr. Chief Justice KELLY joins in this dissent.

---

Original opinion amplified on petition for rehearing June 15, 1943

## ON PETITION FOR REHEARING
### (138 P. (2d) 916)

LUSK, J. The appellants Public Market Company of Portland, Reconstruction Finance Corporation, and the First National Bank of Portland (Oregon) have filed a petition for rehearing in which they ask the court to amplify its opinion with respect to the measure of damages. Specifically, they urge that the Market Company is entitled to recover interest from the date of the breach of the contract on the amount of any damages that may be awarded it. In view of the importance of the question and the fact that it had not heretofore been presented, we called for oral argument.

In our former opinion we held that the city undertook, by the provisions of the contract, to create a special fund by the issuance and sale of public market utility certificates out of which to pay the consideration agreed upon, and that the Market Company had agreed to look for payment solely to the fund so to be created.

We further held that the city had breached the contract by wrongfully refusing to endeavor to create the fund. We likened the case to the so-called local improvement cases in this state in which it is held that a city will not be permitted to escape liability on a contract for work performed by neglecting to levy an assessment in order to create the fund to which the contractor has agreed to look for payment of the contract price; but we pointed out that in that class of cases the city has received the full benefit of the contractor's work and the latter's measure of damages is the full contract price, whereas, in the case at bar, the Market Company owns the land and the building which it erected thereon and, consequently, its recovery is limited to the contract price diminished by the value of the property at the time of the breach.

In the city improvement cases interest has been uniformly allowed: *J. H. Tillman Co. v. Seaside,* 145 Or. 239, 256, 25 P. (2d) 917; *Dennis v. McMinnville,* 128 Or. 101, 269 P. 221; *O'Neil v. Portland,* 59 Or. 84, 87, 113 P. 655 (and cases there cited); and we are of the opinion that the precedents thus established should be followed here unless there is something in the nature of the present case which, under our statute governing the allowance of interest and the decisions construing it, stands in the way.

Section 66-101, O. C. L. A., so far as now material, provides:

"The rate of interest in this state shall be six per centum per annum and no more, and shall be payable in the following cases, to wit:

"(1) On all moneys after the same becomes due;
* * *

"(4) On money due upon the settlement of matured accounts from the day the balance is ascertained."

The city contends that, since the damages are unliquidated, they are not "moneys" within the meaning of Subd. 1, and undoubtedly there are decisions of this court which support that view. See, *Richardson v. Investment Company*, 124 Or. 569, 572, 264 P. 458, 265 P. 1117; *Duncan Lumber Co. v. Willapa Lumber Co.*, 93 Or. 386, 400, 182 P. 172, 183 P. 476; *Propst v. William Hanley Co.*, 94 Or. 397, 404, 185 P. 766; *City of Seaside v. Oregon Surety and Casualty Co.*, 87 Or. 624, 634, 171 P. 396; *Williams v. Pacific Surety Co.*, 77 Or. 210, 221, 146 P. 147, 149 P. 524. The city has also cited upon this point *Compton v. Hammond Lumber Co.*, 154 Or. 650, 652, 61 P. (2d) 1257; but, as that was an action by a seaman to recover damages for a skin disease caused by the defendant's failure to provide sanitary quarters and for subsistence, it can have little, if any, bearing on the present question.

We need not pause to inquire whether, as the appellants argue, these decisions—other than the Compton case—denying interest upon unliquidated claims, are distinguishable because based upon the statute as it read and was construed before the radical amendment of Subd. 1 by Ch. 358, General Laws of Oregon 1917. That would be difficult to say because the construction of the statute before amendment was not always uniform. See, *Sargent v. American Bank and Trust Co.*, 80 Or. 16, 39-46, 154 P. 759, 156 P. 431; *Carnahan Mfg. Co. v. Beebe-Bowles Co.*, 80 Or. 124, 129, 156 P. 584. It is sufficient that in the most recent case of breach of an express contract construing the amended statute this court has departed from the doctrine to which it had previously and consistently adhered. *North Pacific Construction Co. v. Wallowa County*, 119 Or. 565, 249 P. 1100, was a suit by a contractor who

had performed work for a county to set aside the award of an engineer and to obtain a proper allowance for the work performed and not yet paid for. Under its contract with the county to construct two pieces of road the determination of the engineer as to the amount or quantity of work was made final and binding on the parties, and it was provided that within thirty-five days from the filing of the final estimate the county should pay the contractor the balance due after deducting all previous payments. This court held that the award made by the engineer was grossly inadequate, determined the amount to which the contractor was entitled, and further held that, under the first subdivision of § 66-101, O. C. L. A., the contractor was entitled to interest on the balance found due, saying, after refusing to allow certain elements of damage claimed:

> "The plaintiff must be content with the interest on the amount of money that ought to have been paid to it thirty-five days after the filing of the report, which report must be considered as amended to include the sum we have allowed." 119 Or. 572.

This decision is unquestionably authority for the allowance of interest on unliquidated damages growing out of the breach of a contract. It was so considered by the Circuit Court of Appeals for the Ninth Circuit in *Northern Pacific Ry. Co. v. Twohy Bros. Co.,* 95 Fed. (2d) 220. There, under a provision of the contract, a contractor, engaged in constructing a branch line railway for a railway company, was given the right to haul commercial freight upon the branch line during the period of construction, and was to be paid $1 per car mile on the total car miles which the railway hauled. It was found that the railway had breached this provision of the contract by preventing the contractor from haul-

ing the commercial freight, and that the contractor was entitled to recover the $1 per car mile agreed upon, diminished by the contractor's cost of handling, together with the interest on that amount from the date that it should have been paid. The court thought that *Williams v. Pacific Surety Co.*, supra, and *Duncan Lumber Co. v. Willapa Lumber Co.*, supra, were overruled by the reasoning in *North Pacific Construction Co. v. Wallowa County*, supra, "so far as they hold that any lack of liquidation of damages defeats any right to interest under the Oregon statute", and allowed interest on the authority of the Wallowa County case.

■ In this conclusion we think that the Circuit Court of Appeals was right. We are of the opinion, moreover, that the fact that the damages are unliquidated is not necessarily a bar to the allowance of interest, and that "no right reason exists for drawing an arbitrary distinction between liquidated and unliquidated damages." *Bernhard v. Rochester German Insurance Co.*, 79 Conn. 388, 398, 65 Atl. 134, 8 Ann. Cas. 298. The tendency of modern authority is to disregard such a distinction (Restatement, Contracts, § 337, pp. 542-548), at least where "the demand is of such a nature that its exact pecuniary amount was either *ascertained,* or *ascertainable* by simple computation, or by reference to generally recognized standards such as market price", and where "the time from which interest, if allowed, must run,—that is, a time of definite default or tort-feasance,—can be ascertained." 1 Sedg. on Damages (9th Ed.) 571, § 300.

■ In this case both of these elements are present.

The city argues that any damages that might be awarded would constitute "moneys due on settlement of matured accounts", interest on which, under Subd.

4 of the statute, is payable only "from the day the balance is ascertained". The basis of this contention is that an accounting must be had under various provisions of the contract in order to determine the exact amount which the city would have had to pay had it complied with the contract. For example, under Paragraph 2 the Market Company agreed to install in the market building certain equipment and the city agreed to pay to the Market Company the actual cost price of such equipment plus ten per cent, and under Paragraph 6 the Market Company agreed to pay to the city all prepayments of rent and deposits based upon the unexpired portions of existing leases. To determine these and other similar matters an accounting will be necessary. The argument of the city in this connection proceeds very much as though the recovery would be upon the contract, instead of for its breach. Were this the case the question would be foreclosed because it is provided in Paragraph 6 that "as of the date of said conveyances and assignments and of the making of said payment by the City to the Company there shall be an accounting" and that "all payments due from the City to the Company hereunder, if unpaid to the Company when due, shall thereafter bear interest at the rate of six per cent (6%) per annum payable quarter-annually."

The recovery, however, would not be on the contract, but of damages for its breach, though the suit is technically *ex delicto*. The city agreed to pay the Market Company $1,244,790.66 upon completion of its obligations under the contract and tender of proper conveyance and other documents. The exact amount to be paid, however, would no doubt be affected by other provisions to some of which attention has been called, and

the difference between that amount, when ascertained, and the value of the property at the time of the breach would be the measure of the Market Company's damages. In a sense the balancing of accounts would enter into that determination, but only as incidental to the ultimate question of the extent of the damages. The Market Company, if it prevails, will not recover money due upon the settlement of matured accounts, but damages suffered as the result of a breach of contract— "moneys after the same become due".

We see nothing unjust or inequitable in the allowance of interest in such circumstances. The situation is not unlike that portrayed by Circuit Judge Denman in *Northern Pacific Ry. Co. v. Twohy Bros. Co.*, supra, when he said:

" * * * if the railway rightfully permits the contractor to earn the commercial haulage, but wrongfully refuses to pay what is due the contractor, he must pay interest from the date the moneys were due. If, on the other hand, it commits two wrongful breaches of the contract, first, in preventing its performance, and, second, in nonpayment of the amount due, the dual breach enables the contract breaker to have the use of the moneys due the contractor and deprive the contractor of its use until the court compels its payment—here, $125,000 for ten years." 95 Fed. (2d) 226.

In the instant case, if the city had created the fund but refused to pay the money, it would have been liable for interest under the terms of the contract. Why its liability should be any the less because it refused to create the fund, thus compelling the plaintiff to resort to the only remedy left open to it—what is technically an action for tort, but in substance one based on the breach of a contractual obligation—, is not easy to perceive.

 The damages, if any, which the plaintiff will recover will, as we have seen, represent the difference between the value of the property at the time of the breach and the agreed purchase price. The money and its use have been wrongfully withheld from the Market Company by the city ever since the breach. The city ought not to be heard to complain that it did not know and does not now know how much it should pay, because, when called upon to perform, it passed a resolution which in effect denied the existence of a contract with the Market Company and attempted to wash its hands of the whole business. Nor, in our opinion, is there merit in the argument that the exaction of interest would be unfair because, as a result of our decision "the charter will be violated and the burden upon the people will be as great as if a general obligation had been assumed and held valid." The city contended before this court that it had entered into a special fund contract with the Market Company; we so held, and, having done so, we are of the opinion that there is nothing in the nature of a municipal corporation which renders it immune from the duty to make just compensation, including the payment of interest in a proper case, to one whose contractual rights it has violated.

We, of course, neither express nor intimate an opinion that the Market Company is entitled to damages. That question remains to be determined by the trial court upon a consideration of the evidence to be adduced as to the amount of the purchase price and the market value of the property at the time of the breach.

The petition for amplification of the opinion is granted.